

1

2     SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK
3     ----------------------------------------X

4     In re:                        Chapter 7

5                                   Case No.
            MICHAEL HEILBRON,        1-18-42486(ESS)
6
                        Debtor,
7
      ----------------------------------------X
8
      BENJAMIN PLAZA, JR.
9     Chapter 7 Creditor

10                      Plaintiff,

11          -against-                Adv. Pro. No.
                                     18-01055-ESS
12

13    MICHAEL HEILBRON,

14                      Defendant.

15    ----------------------------------------X

16                         August 30, 2018
                           10:00 a.m.
17

18          EXAMINATION BEFORE TRIAL of BENJAMIN
      PLAZA, JR., a Plaintiff herein, taken by Debtor/
19    Defendant, held at the offices of LH Reporting
      Services, 88-36 Sutphin Boulevard, Jamaica, New
20    York, before Lori Hoff-Rooney, a Notary Public
      for and within the State of New York.

21

22

23             LH REPORTING SERVICES, INC.
             Computer-Aided Transcription
24                 88-36 Sutphin Blvd.
                   Jamaica, NY 11435
25

COPY

```
 1

 2              A P P E A R A N C E S:

 3


 4

 5     ROTHSTEIN LAW PLLC
          Attorneys for Plaintiff
 6        The Woolworth Building
          New York, New York  10279
 7     BY:    ERIC E. ROTHSTEIN, ESQ.

 8

 9     GEORGE BASSIAS ATTORNEY LLC
          Attorneys for Debtor/Defendant
10        21-83 Steinway Street
          Astoria, New York  11105
11     BY:    GEORGE BASSIAS, ESQ.

12

13
       Also Present:  Mr. Roberto Castillo, Intern
14

15

16

17

18              *        *        *        *        *

19

20

21

22

23

24

25
```

```
1

2                    221. UNIFORM RULES FOR THE

3                      CONDUCT OF DEPOSITIONS

4        221.1 Objections at Depositions
         (A) Objections in general. No objections
5        shall be made at a deposition except those
         which, pursuant to subdivision (b), (c) or (d)
6        of Rule 3115 of the Civil Practice Law and
         Rules, would be waived if not interposed, and
7        except in compliance with subdivision (e) of
         such rule. All objections made at a
8        deposition shall be noted by the officer
         before whom the deposition is taken, and the
9        answer shall be given and the deposition shall
         proceed subject to the objections and to the
10       right of a person to apply for appropriate
         relief pursuant to Article 31 of the CPLR.
11       (B) Speaking objections restricted. Every
         objection raised during a deposition shall be
12       stated succinctly and framed so as not to
         suggest an answer to the deponent and, at the
13       request of the questioning attorney, shall
         include a clear statement as to any defect in
14       form or other basis of error or irregularity.
         Except to the extent permitted by CPLR Rule
15       3115 or by this rule, during the course of the
         examination, persons in attendance shall not
16       make statements or comments that interfere
         with the questioning.
17
         221.2 Refusal to answer when objection is
18       made. A deponent shall answer all questions at
         a deposition, except (i) to preserve a
19       privilege or right of confidentiality, (ii) to
         enforce a limitation set forth in an order of
20       the Court, or (iii) when the question is
         plainly improper and would, if answered, cause
21       significant prejudice to any person. An
         attorney shall not direct a deponent not to
22       answer except as provided in CPLR Rule 3115 or
         this subdivision. Any refusal to answer or
23       direction not to answer shall be accompanied
         by a succinct and clear statement of the basis
24       therefore. If the deponent does not answer a
         question, the examining party shall have the
25       right to complete the remainder of the
         deposition.
```

1

2    221.3 Communication with the deponent.
     An attorney shall not interrupt the
3    deposition for the purpose of communicating
     with the deponent unless all parties consent
4    or the communication is made for the purpose
     of determining whether the question should not
5    be answered on the grounds set forth in
     Section 221.2 of these rules and, in such
6    event, the reason for the communication shall
     be stated for the record succinctly and
7    clearly.

8     IT IS FURTHER STIPULATED AND AGREED that
     The transcript may be signed before a Notary
9    Public with the same force and effect as if
     Signed before a clerk or a Judge of the court.
10

11    IT IS FURTHER STIPULATED AND AGREED that
     the examination before trial may be utilized
     for all purposes as provided by the CPLR.
12

13    IT IS FURTHER STIPULATED AND AGREED that
     all rights provided to all parties by the CPLR
     cannot be deemed waived and the appropriate
14   sections of the CPLR shall be controlling with
     respect hereto.
15

16    IT IS FURTHER STIPULATED AND AGREED by
     and between the attorneys for the respective
     parties hereto that a copy of this examination
17   shall be furnished, without charge, to the
     attorneys representing the witness testifying
18   herein.

19

20

21

22

23

24

25

1                    BENJAMIN PLAZA, JR.

2    B E N J A M I N    P L A Z A,    J R., having

3         first been duly sworn by a Notary Public

4         for and within the State of New York, upon

5         being examined, testified as follows:

6              THE REPORTER:  Please state your

7         name for the record.

8              THE WITNESS:  Benjamin Plaza, Jr.

9              THE REPORTER:  What is your current

10         address?

11              THE WITNESS:  6172 Northern

12         Boulevard, East Norwich, New York 11732.

13    EXAMINATION BY

14    MR. BASSIAS:

15              MR. BASSIAS:  Good morning, Mr.

16         Plaza.  My name is George Bassias.  I am

17         an attorney and I represent Michael

18         Heilbron in a bankruptcy case.  We are

19         here deposing you today in regards to an

20         adversary proceeding that you brought

21         against him.  I am going to ask you some

22         questions.  If you don't understand the

23         question, let me know I will rephrase

24         it.

25              Please keep your responses verbal so

1          BENJAMIN PLAZA, JR.

2        the court reporter can take down what

3        you are saying.

4      Q.   Are you currently employed?

5      A.   Yes.

6      Q.   What do you do?

7      A.   I work for the M.T.A., superintendent

8    of maintenance, buses.

9      Q.   Have you ever done any depositions

10   before for the M.T.A.?

11     A.   Just testimonies.

12     Q.   Are you referring to trials, as a

13   witness?

14     A.   Not a witness, as a -- just basically

15   as a facilitator of information on behalf of

16   the M.T.A.

17     Q.   What is your highest level of

18   education?

19     A.   Associate's Degree.

20     Q.   I am sorry?

21     A.   Associate's Degree.

22     Q.   Associate's in what field?

23     A.   Applied Science.

24     Q.   What is your date of birth?

25     A.   10/05/82.

1          BENJAMIN PLAZA, JR.

2          MR. BASSIAS:  I am going to ask you

3       for your Social Security number.

4          Please only take down the last four

5       numbers of the Social Security number.

6    Q.  Can I have your Social Security

7    number, please?

8    A.  3305.

9    Q.  The current job that you have, how

10   long have you been working there?

11   A.  Three years.

12   Q.  What did you do before that?

13   A.  Aircraft maintenance for American

14   Airlines.

15   Q.  How long did you do that for?

16   A.  Five years.

17   Q.  How about before that?

18   A.  North American Airlines, technical

19   rider.

20   Q.  Are you married?

21   A.  Yes.

22   Q.  How long have you been married?

23   A.  A month and -- well, a month.

24   Q.  Congratulations.

25   A.  Thank you.

BENJAMIN PLAZA, JR.

Q. Any children?

A. No.

Q. Do you know the defendant in this
action, Michael Heilbron?

A. Yes.

Q. How long have you known him?

A. Only for the time that that happened;
which is probably only, no more than a year.

Q. You knew him a year before this
incident?

A. During.

Q. Okay. Just so the record is clear,
how long before this incident did you know him?

A. I didn't know him.

Q. It is your testimony, today, that the
first time you met him was when this incident
happened?

A. No. That is not what I said. I said
I have known him for a year. And the incident,
that ties into the year.

Q. Okay. So how long before the incident
did you know him?

A. Well, when did it happen?

Q. According to your attorney's

1          BENJAMIN PLAZA, JR.
2    Complaint, the incident happened June 29, 2008.
3          A.  So, a year from that date.
4          Q.  So, a year prior to that?
5          A.  Yeah.
6          Q.  Where did you first meet him?
7          A.  Mutual friend.
8          Q.  What is the name of that friend?
9          A.  His name is Gabriel Estevido
10   (phonetic).
11         Q.  If you recall, where did you meet Mr.
12   Heilbron?
13         A.  I don't recall.
14         Q.  Since you met him, did you have
15   occasions to socialize with Mr. Heilbron?
16         A.  Only with mutual friends.  That is
17   basically it.  Occasions.
18         Q.  Were there instances where you went
19   out with Mr. Heilbron?
20         A.  Like I said, through mutual occasions.
21         Q.  Through mutual friends?
22         A.  Right.
23         Q.  Are there any specific incidents that
24   you remember prior to this incident where you
25   went, where you socialized with Mr. Heilbron?

BENJAMIN PLAZA, JR.

1

2     A.  It could have been at a bar.

3 Occasions where you have drinks.  That is

4 pretty much it.

5     Q.  Now, is Gabriel Estevido, to your

6 knowledge, a friend of Mr. Heilbron?

7     A.  At this the point, I don't know.  I

8 don't talk to neither of them.

9     Q.  Was he a friend of his at the time of

10 the incident?

11     A.  A mutual friend.

12     Q.  Are you and Mr. Mr. Heilbron

13 approximately the same age?

14     A.  No.

15     Q.  Do you know you how old Mr. Heilbron

16 is?

17     A.  I don't know.  It should state that in

18 his papers.  He is younger though.

19     Q.  Were you ever friends with Mr.

20 Heilbron on any type of social media, like

21 Facebook?

22     A.  No.

23     Q.  Did you ever communicate, prior to

24 this incident, with Mr. Heilbron with your cell

25 phone or his cell phone?

1          BENJAMIN PLAZA, JR.

2      A.   Communicate in what --

3      Q.   Did you ever talk to him on your cell

4  phone?

5      A.   Yeah, you know.

6      Q.   Did you have his phone number on your

7  cell phone?

8      A.   I believe I might have, yes.

9      Q.   Do you still have that carrier, that

10  cell phone carrier?

11      A.   I don't know.  I don't think so.  No.

12      Q.   Who is your current carrier?

13      A.   Verizon.

14      Q.   Did you ever have any cell phone

15  carriers other than Verizon since you have

16  owned a cell phone?

17      A.   It has been a couple; Verizon,

18  T-Mobile, Sprint.

19      Q.   Tell me about June 29, 2008.

20          What time did this incident happen?

21      A.   It was in the later part of the

22  evening.  I don't know the exact time because

23  it is over ten years already.  I was basically

24  on my way to work.  I worked the midnight shift

25  at LaGuardia airport.  And in exiting my house,

BENJAMIN PLAZA, JR.

1

2     walking down the block to go to my car to

3     proceed to go to my job, I was approached by

4     two individuals.  The third party is still

5     unknown.  And at that point, there was a verbal

6     conversation between myself and Mr. Heilbron.

7     And that the point, I felt that I was being

8     trapped, given my location between a parked car

9     and a stationary object.  And as soon as I

10    started to -- I felt that things were going in

11    the wrong direction.  The third individual

12    struck me in the right side.  And then,

13    Heilbron struck me in the jaw, which actually

14    broke the jaw in two places.

15        Q.  Now, you mentioned you were met with

16    Heilbron and two individuals --

17        A.  A third individual, a third party.

18        Q.  Heilbron -- Oh, so there were two

19    people?

20        A.  Correct.

21        Q.  Can you describe that other person to

22    me?

23        A.  Like I said, it has been ten years.

24    It is basically a Hispanic male, same height as

25    him, light skin.  I don't know the individual's

                    BENJAMIN PLAZA, JR.

1    name.

2        Q.  Had you spoken to Mr. Heilbron on June

3    29th before this incident at all?

4        A.  Not that I recall.

5        Q.  Had you communicated with him at all

6    on any type of social media?

7        A.  No.

8        Q.  So, when Mr. Heilbron and this other

9    individual approached you, did they speak to

10   you and did you speak to them about anything?

11       A.  Like I said, as I was proceeding

12   walking to my car, two individuals came up to

13   me, one being Mr. Heilbron.  The other

14   individual which we don't know, as in their

15   first initial meeting with them, the

16   conversation is "Hey, what is going on?  How

17   are you doing."  And then the actual dialogue

18   between Heilbron and I was, you know, "What is

19   going on with you and Melissa?"

20       Q.  Okay.  So now, who said, "Hey, what is

21   going on?"  Did you say it to them or did they

22   say it to you?

23       A.  They said it to me, mainly Heilbron.

24       Q.  Who said, What is going on with

1              BENJAMIN PLAZA, JR.

2        Melissa?

3             A.   Heilbron.

4             Q.   And he said that to you?

5             A.   Yeah.

6             Q.   Who is Melissa?

7             A.   Melissa is a mutual friend that we

8        went to high school with.  In the same,

9        basically, industry as I was in, aviation.

10            Q.   Was she working at the same job that

11       you were working in?

12            A.   No.  Not that I recall.

13            Q.   How did you know Melissa?

14            A.   Through mutual friends, through

15       school, Aviation High School.

16            Q.   Did Mr. Heilbron know Melissa?

17            A.   Yes.

18            Q.   How did he know her?

19            A.   I believe that they were dating at

20       some point.

21            Q.   So, other than saying to you "What is

22       going on with you and Melissa," did he say

23       anything else to you?

24            A.   No.  There was really nothing else

25       that was stated after that.

BENJAMIN PLAZA, JR.

1

2    Q.  Did you respond to him and ask him

3    what he meant by "What is going on with you and

4    Melissa"?

5    A.  No, because like I said, everything

6    happened so fast that by the time I could even

7    explain it, the third individual struck me, and

8    then that is when Heilbron struck me in the

9    jaw.

10    Q.  Was Gabriel Estevido there at that

11    time?

12    A.  No.

13    Q.  Now, were you friends with Melissa on

14    any type of social media?

15    A.  No.

16    Q.  At any time prior to this incident,

17    had you -- and during what you perceived to be

18    a time period when Heilbron was dating

19    Melissa -- did you go on any dates with

20    Melissa?

21    MR. ROTHSTEIN:  Objection to the

22    form.  You kind of put in two different

23    periods of time.

24    MR. BASSIAS:  I will rephrase it.

25    Q.  Had you dated Melissa at all prior to

BENJAMIN PLAZA, JR.

1  BENJAMIN PLAZA, JR.

2  the incident?

3       A.   It was just on a friendship basis.

4       Q.   Is that a yes?

5       A.   Yeah.  But it wasn't anything serious.

6       Q.   How many times had you dated her prior

7  to this incident?

8       A.   Just once.

9       Q.   One time?

10      A.   Yes.

11      Q.   Was it your perception that when Mr.

12  Heilbron asked you what was going on with you

13  and Melissa, that he was referring to this date

14  that you had with Melissa?

15      A.   No.

16      Q.   What was your impression that he was

17  asking you this question for.

18      A.   It was an open question.  I didn't

19  understand his question.

20      Q.   Did you tell him that you didn't

21  understand his question?

22      A.   I didn't have time to tell him.

23      Q.   At any time during this incident, did

24  you ever hit Mr. Heilbron?

25      A.   No.

1          BENJAMIN PLAZA, JR.

2      Q.  Did you ever hit the other individual?

3      A.  No.

4      Q.  So, you mentioned that the other

5  individual hit you first?

6      A.  Yes.

7      Q.  Where did he hit you?

8      A.  Right side, earlobe.

9      Q.  And as a result of that hit, did you

10  fall to the ground?

11      A.  No.  It actually put me in striking

12  distance of Heilbron which caused the actual

13  blow to break the jaw twice.

14      Q.  All right.  So --

15      A.  Do you want me to show you?

16      Q.  No.

17          MR. BASSIAS:  Off the record for a

18      second.

19          (Whereupon, a discussion was held

20      off the record.)

21      Q.  So, you mentioned you were struck

22  twice on the right side of your jaw.

23          MR. ROTHSTEIN:  I don't think he

24      said that.  I think he said he was

25      struck twice.

BENJAMIN PLAZA, JR.

1

2      A.   I said I was struck twice, one being

3   from the third individual on the right side

4   earlobe.   The second strike was from Mr.

5   Heilbron which broke the jaw twice.

6      Q.   Is it your testimony that during this

7   entire period, you did nothing to defend

8   yourself?

9      A.   How can I?

10     Q.   Did you ever raise your hands to block

11  any of the punches?

12     A.   No.

13     Q.   Did you see Mr. Heilbron taking a

14  swing at you before he hit you?

15     A.   No.

16     Q.   What were you looking at that time

17  that Mr. Heilbron struck you?

18     A.   The ground.

19     Q.   So, is it your testimony that when Mr.

20  Heilbron hit you, you were already on the

21  ground?

22     A.   No.

23     Q.   At the time just before Mr. Heilbron

24  hit you, what were you looking at?   The instant

25  just before he hit you.

BENJAMIN PLAZA, JR.

1

2      A.    I was looking at the ground because of

3   the right earlobe strike, it caused my head to

4   go down.

5      Q.    Okay.

6      A.    And then what happened after that was

7   the actual strike by Mr. Mr. Heilbron.

8      Q.    And then what happened after Mr.

9   Heilbron struck you?

10      A.    I grabbed my jaw because I knew it

11   broke, which I was then in complete shock.  And

12   I proceeded to walk back to my house as fast as

13   I can to get medical attention, because my aunt

14   was in the house and she is a registered nurse.

15   So, I asked her to help me as soon as she can.

16   What happened to them, I don't know.  They

17   left.

18      Q.    So, other than yourself, Mr. Heilbron

19   and that third individual, do you know of any

20   other witnesses to this incident?

21      A.    No.

22      Q.    You went back and you saw your aunt.

23          Did your aunt examine you?

24      A.    Yeah.  She is the one who called the

25   police, and is she is the one that helped,

BENJAMIN PLAZA, JR.

1
2    somewhat, stop the bleeding.

3        Q.   Where were you bleeding?

4        A.   Through my mouth and ear.

5        Q.   Did you then go to the hospital?

6        A.   Yes.  Emergency.

7        Q.   How did you get to the hospital?

8        A.   Ambulance.

9        Q.   An ambulance came and picked you up at

10   your house?

11       A.   I believe so, yes.

12       Q.   Were you admitted in the hospital or

13   were you treated there as an outpatient?

14       A.   I was admitted and then I was at, I

15   think that is Mount Sinai, Queens.  But then

16   from there -- the actual extent of the damage

17   was too severe that they had to admit me to

18   Manhattan, Mount Sinai, I believe.  Yeah.

19       Q.   So, you were transferred --

20       A.   From Queens to Manhattan.

21       Q.   To Manhattan.

22            What did they do for you in Queens, if

23   anything?

24       A.   They just basically did -- from what I

25   recall, you know what?  I don't recall.

BENJAMIN PLAZA, JR.

1

2        Q.   You don't recall?

3        A.   No.

4        Q.   What was the purpose of you being

5    transferred to Manhattan?

6        A.   Because of the specialist that needed

7    to handle my particular case.

8        Q.   Did you have surgery?

9        A.   Yes.

10       Q.   What were the findings after all your

11   treatment, diagnosis, prognosis?

12       A.   Well, they had to wire the mouth shut.

13   They had to put a plate in the lower jaw area.

14   They had to also put a the plate here

15   (indicating) to fix that break.  And then, the

16   actual -- also the oral surgery that had to be

17   done was with the teeth, the molars, stuff like

18   that.

19       Q.   Prior to this incident, did you ever

20   have any problems with your teeth and your jaws

21   in --

22       A.   No.

23       Q.   -- in the area that -- please let me

24   finish for the record.

25            Did you ever have any problems with

```
 1                    BENJAMIN PLAZA, JR.

 2      your teeth or your jaws?

 3           A.   No.

 4           Q.   When was the last time that you saw a

 5      dentist prior to this incident?

 6           A.   About a week and a half ago.

 7           Q.   What was the purpose of that visit?

 8           A.   To follow up, to make --

 9                MR. ROTHSTEIN:  I'm sorry.  Are you

10           talking about before the incident?

11                MR. BASSIAS:  Before the incident.

12                MR. ROTHSTEIN:  He is talking about

13           ten years ago, before the incident.

14                THE WITNESS:  Oh.

15                MR. ROTHSTEIN:  He is answering now.

16           Q.   I meant before the incident, when is

17      the last time you saw a dentist?

18           A.   The accident was about ten years ago.

19      I don't recall.

20           Q.   Prior to this incident, were you ever

21      diagnosed with problems for your jaw, like TMJ?

22           A.   No.

23           Q.   Did you ever have any surgery to that

24      side of your mouth where your teeth are, prior

25      to this incident?
```

BENJAMIN PLAZA, JR.

1

2          A.   No.

3          Q.   After the incident, did you ever

4     communicate with Mr. Heilbron?

5          A.   No.

6          Q.   Did you call him or did you talk to

7     him?

8          A.   No.

9          Q.   Did you call the police to the scene?

10          A.   That was -- that was handled either by

11     my aunt or my sister.

12          Q.   Do you know when this matter was

13     reported to the police?

14          A.   As soon as it happened.

15          Q.   Were you ever interviewed by a

16     detective or anybody?

17          A.   I believe so.  I was.

18          Q.   Did they come to your house or did you

19     go to the station?

20          A.   I don't recall.  I don't remember.

21          Q.   Did you tell them about this other

22     individual?

23          A.   Yes.

24          Q.   Do you know if this other individual

25     was ever identified?

BENJAMIN PLAZA, JR.

A.  No, because he never gave him up.

Q.  After this incident happened, did you ever have anything happen where you reinjured your jaw?

A.  No.

Q.  Okay.  Now --

MR. BASSIAS:  Off the record a second.

(Whereupon, a discussion was held off the record.)

Q.  As we sit here today, do you have any present complaints about the injuries you sustained in this accident?

A.  Yes.  I deal with it every day.

Q.  What are the complaints?

A.  Stiffness, joint pain, teeth moving, hence the reason for the annual checkups.  The molar cap that I have, to make sure it is secured.

Q.  After this incident, did you ever talk to Melissa in regards to this incident?

A.  No.

Q.  Do you know if Melissa is aware of this incident?

1                    BENJAMIN PLAZA, JR.

2         A.   Yes, she is.

3         Q.   How do you know she is aware of it?

4         A.   Because it was brought to her

5    attention, I believe, when I was in the

6    hospital.

7         Q.   Who brought it to her attention?

8         A.   It could have been either my sister or

9    myself, from what I recall.

10        Q.   Did you meet Michael Heilbron in high

11   school?

12        A.   No.

13        Q.   Did you go to the same high school

14   together?

15        A.   I don't know, what high school did he

16   go to?

17        Q.   What high school did you go to?

18        A.   Aviation High School.

19        Q.   Did Michael Heilbron live in the same

20   neighborhood that you lived in?

21        A.   No.

22        Q.   Do you know where he lived?

23        A.   I am not sure.  I think it might be

24   East -- I think it is Elmhurst, if I am not

25   mistaken.

1             BENJAMIN PLAZA, JR.

2        Q.   Have you ever been to his house prior

3    to the incident?

4        A.   No.

5        Q.   According to Mr. Heilbron, you have

6    been over to his house for dinner with his

7    family.

8             Is that an incorrect statement?

9        A.   Yes.

10       Q.   At any point in time during the

11   incident with Mr. Heilbron, did you grab Mr.

12   Heilbron?

13       A.   No.

14       Q.   At any point in time during the

15   incident, did you take any swings at Mr.

16   Heilbron?

17       A.   No.

18       Q.   You mentioned that when the first

19   person hit you, your jaw broke.

20            How did you become aware that your jaw

21   was broken?

22            MR. ROTHSTEIN:   Objection to the

23        form.   That is not what he said; not the

24        first punch.   Mr. Heilbron broke his

25        jaw.

1               BENJAMIN PLAZA, JR.

2               MR. BASSIAS:  No, he mentioned --

3           Can you go back?

4               (Whereupon, the reporter read the

5           requested portion of the record.)

6       Q.  As a result of the first individual

7   hitting you, was it your understanding that

8   your jaw broke?

9       A.  Say that again.

10      Q.  As a result of first person hitting

11  you, that third-party, that unknown person, did

12  you understand that as a result of him hitting

13  you, that your jaw broke?

14      A.  It didn't break at that point.

15      Q.  What, if anything, happened as a

16  result of him hitting you?

17              MR. ROTHSTEIN:  Let's be clear.  The

18          first person?

19              MR. BASSIAS:  Yes.

20      A.  The first person, when he struck me,

21  he cut the earlobe with some type of object.

22      Q.  He was holding an object?

23      A.  Well, how do you cut someone's

24  earlobe?  You don't cut it with your fingers.

25  It has got to be something.

BENJAMIN PLAZA, JR.

1

2    Q.    Okay.  But I'm understanding from your

3    testimony, correct me if I'm wrong, that you're

4    concluding that he was holding an object

5    because your earlobe was bleeding.

6    A.    Yeah, my earlobe was cut.

7    Q.    At any point in time, did you see Mr.

8    Heilbron holding an object?

9    A.    No.

10    Q.    Other than his hand, did any other

11    part of Mr. Heilbron's body come into contact

12    with you?

13    A.    No.

14    Q.    Now, you mentioned that as a result of

15    Mr. Heilbron hitting you, your jaw broke twice.

16    A.    Yes.

17    Q.    Did he hit you once or did he hit you

18    twice?

19    A.    Once.

20    Q.    Did that one hit cause your jaw to

21    break in two places?

22    A.    Yes.

23    Q.    Which part of your jaw, was it your

24    understanding, broke?

25    A.    The center and (indicating) -- the

1                    BENJAMIN PLAZA, JR.

2    terminology, I don't know.  But there is

3    terminology.

4              MR. BASSIAS:  Indicating towards his

5         right earlobe.

6              THE WITNESS:  Yes.

7              MR. BASSIAS:  Indicating towards

8         your right earlobe?

9              THE WITNESS:  Yes.  It broke here

10        and it broke here (indicating).

11    Q.   Okay.  So, now, where did Mr. --

12              MR. ROTHSTEIN:  Let it be clear.

13         Did it break on your jaw or by your

14         earlobe?

15              THE WITNESS:  My jaw.

16    Q.   Which part of your jaw broke?

17    A.   Here (indicating).

18              MR. BASSIAS:  Indicating your chin.

19    Q.   Did your jaw also break close to your

20    earlobe?

21    A.   It broke here (indicating).

22    Q.   What kind of break happened with your

23    jaw towards your chin and what kind of break

24    was it towards your ear?

25    A.   (No verbal response.)

1              BENJAMIN PLAZA, JR.

2         Q.   Was it a hairline fracture?   Was it --

3         A.   It was a complete fracture.

4         Q.   A complete fracture.

5              The area of your chin, did it break in

6    half?   Did it separate?

7         A.   It broke in half.

8         Q.   Broke in half.

9              What about your earlobe?

10        A.   Broke in half.

11        Q.   Broke in half.   Okay.

12             Where did Mr. Heilbron's hand hit you;

13   on the chin or towards the ear?

14        A.   Here (indicating).

15             MR. BASSIAS:   Indicating the left

16        side.

17             THE WITNESS:   The left jaw.

18        Q.   The left jaw.

19             Is it your testimony that as a result

20   of him hitting you on the left jaw, that your

21   chin broke and right side of your jaw broke?

22        A.   Yes.

23        Q.   I am sorry?

24        A.   Yes.

25        Q.   Is it possible that your jaw broke

BENJAMIN PLAZA, JR.

1
2      when you fell to the ground and hit the ground?

3             MR. ROTHSTEIN:  Objection to the

4          form.  He never said he fell to the

5          ground.

6          Q.   Did you fall to the ground after Mr.

7      Heilbron hit you?

8          A.   No.

9          Q.   At any time, did you fall to the

10     ground?

11         A.   No.

12         Q.   At any point in time, did you lose

13     consciousness?

14         A.   No.

15         Q.   How do you know that your jaw broke as

16     a result of Mr. Heilbron hitting you and not

17     the first person hitting you?

18         A.   Because of the actual impact of the

19     punch.  I heard it snap, and then after that,

20     blood came out of my mouth.  And after that,

21     the jaw was moving freely.

22         Q.   When the first individual hit you, how

23     did you feel?

24         A.   Caught off guard.

25         Q.   Did it daze you at all?

1                BENJAMIN PLAZA, JR.

2          A.   It didn't daze me.  All it made me do

3      is move my head down which was in striking

4      range of Mr. Heilbron to break my jaw.

5          Q.   How much time elapsed from the time

6      the first guy hit you until --

7          A.   Seconds.

8          Q.   -- until Mr. Heilbron hit you?

9               What were the lighting conditions like

10     at that time?

11         A.   Evening, which is streetlights.

12         Q.   Could you see clearly?

13         A.   Yes.

14         Q.   Had you had any alcohol to drink

15     within 24 hours of this incident?

16         A.   No.

17         Q.   Had you taken any prescription or

18     nonprescription drugs within 24 hour of this

19     incident?

20         A.   No.

21         Q.   Do you wear glasses?

22         A.   At that point -- no, I wasn't wearing

23     glasses at that point.

24         Q.   At that point, at the time of the

25     incident, had any physician ever prescribed you

BENJAMIN PLAZA, JR.

1  
2    prescription for lenses or contact lenses?

3        A.   I don't recall because I know for a

4    fact that I had to be wearing either contacts

5    or I had my LASIK surgery already.  I can't get

6    the time, the years, down.  But no, I was not

7    wearing any prescription lenses that the point.

8        Q.   Did you ever see Mr. Heilbron, again,

9    after this incident?

10       A.   No.

11       Q.   Did you ever see Gabriel Estevido

12   again after this incident?

13       A.   No -- well, sorry.  I will retract

14   that.  We work together so -- as far as seeing

15   him, yeah, because we work together at the same

16   job.

17       Q.   Did you ever discuss this incident

18   with Gabriel Estevido after this incident?

19       A.   No.  I didn't want to get into it.

20       Q.   Correct me if I'm wrong, but did you

21   testify earlier that you no longer speak to

22   Gabriel Estevido?

23       A.   I don't talk to him.

24       Q.   Does your not talking to him have

25   anything to do with this incident?

1          BENJAMIN PLAZA, JR.

2          MR. ROTHSTEIN:  Him or her?

3     Q.   Is Gabriel a male or female?

4     A.   Male.

5     Q.   Does your not talking to him have

6  anything to do with this incident?

7     A.   I just don't talk to him.  No, it

8  doesn't.

9          MR. BASSIAS:  I have no further

10         questions.

11         Thank you.

12         MR. ROTHSTEIN:  Thank you.

13         (Thereupon, the examination was

14         concluded at 10:32 a.m.)

15

16

17

18

19                         .

20

21

22

23

24

25

```
 1                      BENJAMIN PLAZA, JR.

 2             A C K N O W L E D G M E N T

 3

 4

 5       STATE OF NEW YORK)

 6                         :ss

 7       COUNTY OF         )

 8            I, BENJAMIN PLAZA, JR., hereby certify

 9    that I have read the transcript of my testimony

10    taken under oath on 08/30/2018; that the

11    transcript is a true, complete and correct

12    record of what was asked, answered and said

13    during this proceeding, and that the answers on

14    the record as given by me are true and correct.

15

16

17                      --------------------------
                        BENJAMIN PLAZA, JR.
18

19

20       Signed and subscribed to
         before me this _____ day
21       of _____, 2018

22

23       _____
              Notary Public
24

25
```

LH REPORTING SERVICES, INC. 718-526-7100

1          BENJAMIN PLAZA, JR.

2          C E R T I F I C A T E

3     STATE OF NEW YORK)

4                  :ss

5     COUNTY OF NASSAU )

6

7          I, LORI HOFF-ROONEY, a Notary Public

8     within and for the State of New York, do hereby

9     certify:

10          That the witness whose examination is

11    hereinbefore set forth was duly sworn and that

12    such an examination is a true record of the

13    testimony given by such a witness.

14          I further certify that I am not related to

15    any of these parties to this action by blood or

16    marriage, and that I am not in any way

17    interested in the outcome of this matter.

18          IN WITNESS WHEREOF, I have hereunto set my

19    hand this 30th day of August, 2018.

20

21

22

23                        *Lori Hoff Rooney*
                          Lori Hoff-Rooney

24

25

1                       BENJAMIN PLAZA, JR.

2                            INDEX

3              EXAMINATION OF BENJAMIN PLAZA, JR.

4     EXAMINATION BY                        PAGE

5     GEORGE BASSIAS                          5

6

7

8

9

10                          EXHIBITS

11    THERE WERE NO EXHIBITS MARKED FOR IDENTIFICATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25