UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re:                                                      Chapter 7

MICHAEL HEILBRON,                                           Case No. 18-42486-ess

                        Debtor.
----------------------------------------------------------------x

BENJAMIN PLAZA, JR.,                                        Adv. Pro. No. 18-01055-ess

                        Plaintiff,

        -against-

MICHAEL HEILBRON,

                        Defendant.
----------------------------------------------------------------x

## MEMORANDUM DECISION AFTER TRIAL

Appearances:

Eric Edward Rothstein, Esq.            George Bassias, Esq.
Rothstein Law PLLC                 George Bassias Attorney LLC
The Woolworth Building              21-83 Steinway
233 Broadway, Suite 900             Astoria, New York 11105
New York, NY 10279

*Attorneys for Benjamin Plaza, Jr.*        *Attorneys for Michael Heilbron*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

This adversary proceeding arises from a fistfight between the debtor, Michael Heilbron, and the plaintiff, Benjamin Plaza, Jr., on June 29, 2008; Mr. Heilbron's criminal plea to a single misdemeanor assault charge; a default judgment in Mr. Plaza's personal injury action against Mr. Heilbron; and now, Mr. Heilbron's attempt to discharge the default judgment debt in a Chapter 7 bankruptcy case.

On May 7, 2018, Mr. Plaza commenced this adversary proceeding by filing a complaint against Mr. Heilbron, the debtor in the underlying Chapter 7 case. Mr. Plaza seeks a determination that the debt that Mr. Heilbron owes to him pursuant to a default judgment for civil claims for assault and battery (the "Default Judgment"), entered in a state court action entitled *Benjamin Plaza, Jr. v. Michael Heilbron*, in New York Supreme Court, Queens County (the "Queens Supreme Court Action"), is nondischargeable under Bankruptcy Code Section 523(a)(6).

On December 20, 2018, Mr. Plaza filed a Motion for Summary Judgment (the "Summary Judgment Motion" or "Summ. J. Mot."). In the Summary Judgment Motion, Mr. Plaza argued that there was no genuine issue of material fact as to whether the debt resulted from a "willful and malicious injury by the debtor to another entity" under Section 523(a)(6), because the doctrine of collateral estoppel prevented Mr. Heilbron from contesting those elements, in light of his guilty plea to a misdemeanor criminal charge of Assault in the Third Degree in Queens Criminal Court, and the Default Judgment in the Queens Supreme Court Action.

On January 15, 2020, this Court entered an order granting Mr. Plaza's Summary Judgment Motion, and Mr. Heilbron appealed from that judgment. On appeal, the District Court

found that neither Mr. Heilbron's guilty plea nor the Default Judgment established that Mr. Heilbron had acted in a "willful and malicious" manner and remanded for trial on the twin issues of whether Mr. Heilbron had acted willfully and whether he had acted maliciously.

On February 23 and 24, 2023, this Court held trial on those questions. The Court now decides whether Mr. Plaza has met his burden to show that Mr. Heilbron's conduct was "willful" and "malicious." If so, then Mr. Heilbron's debt to Mr. Plaza will be excluded from the scope of Mr. Heilbron's Chapter 7 bankruptcy discharge. But if not, then the debt will be discharged.

### <u>Jurisdiction and Authority to Enter a Final Judgment</u>

Mr. Plaza's nondischargeability claim arises under Bankruptcy Code Section 523(a)(6) and is a core matter. 28 U.S.C. § 157(b)(2)(I). As a core matter, this Court has constitutional authority to enter a final judgment because the claim alleged in the amended complaint stems "from the bankruptcy itself." *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

For these reasons, this Court has jurisdiction to consider and enter judgment on this claim under Judiciary Code Section 1334(b) and the Standing Order of Reference dated August 28, 1986, as amended by Order dated December 5, 2012, of the United States District Court for the Eastern District of New York.

### <u>Background and Procedural History</u>

This nondischargeability action arises from an altercation that occurred in 2008, the guilty plea that Mr. Heilbron entered in the resulting criminal case, and a civil default judgment entered in the related lawsuit instituted by Mr. Plaza in 2009. Because they provide the context both for this adversary proceeding and the issues presented at trial, the circumstances of these events are summarized below.

*The Altercation*

More than fifteen years ago, on the evening of June 29, 2008, Mr. Heilbron punched Mr. Plaza in the chin, breaking his jaw. His injury is described in the record as "a fractured mandible that required open reduction, [and] internal fixation" of his jaw. Am. Compl. ¶ 8, ECF No. 6. Soon thereafter, Mr. Heilbron was placed under arrest by the New York City Police Department. Am. Compl. ¶ 11.

*The Queens Criminal Court Action*

On July 1, 2008, Mr. Heilbron was charged with two counts of Assault in the Second Degree, Penal Law §§ 120.05(1) and (2), one count of Assault in the Third Degree, Penal Law § 120.00(1), and one count of Harassment in the Second Degree, Penal Law § 240.26(1) (the "Queens Criminal Court Action"). Am. Compl. ¶ 12.

The criminal complaint that resulted from Mr. Heilbron's arrest, sworn to by Detective Victor Herrera of Queens Detective Area 114 (the "Criminal Complaint" or "Crim. Compl."), states that on June 29, 2008 between 10:30 PM and 10:40 PM, at the northeast intersection of 78th Street and 21st Avenue in Queens, New York, Mr. Heilbron committed an assault in violation of New York Penal Law Section 120.05-1 (Assault in the Second Degree), Section 120.05-2 (Assault in the Second Degree), Section 120.00-1 (Assault in the Third Degree), and Section 240.26-1 (Harassment in the Second Degree). Summ. J. Mot. Exh. A, ECF No. 13-1 (Crim. Compl.).

The Criminal Complaint identifies Mr. Plaza as the source of Detective Herrera's information, and continues:

> [A]n unapprehended other struck [Mr. Plaza] in the side of his head with an unknown hard object causing [Mr. Plaza] to fall forward and [Mr. Heilbron] proceeded to punch [Mr. Plaza] in his chin causing his jaw to break into two

pieces and his tooth to break and a laceration to [Mr. Plaza's] right ear as well as substantial pain.  . . .

[Detective Herrera] states that [Mr. Plaza] was admitted to a local area hospital where he received surgery for [his] jaw.

[Detective Herrera] states that he is further informed by [Mr. Plaza] that the abovementioned actions of [Mr. Heilbron] and unapprehended other caused him annoyance and alarm.

Summ. J. Mot. Exh. A., Crim. Compl. at 1.

More than seven months later, on February 5, 2009, Mr. Heilbron appeared before the Honorable Dorothy Chin Brandt of the Criminal Court of the City of New York, County of Queens: Part AP-6 (the "Queens Criminal Court") for a plea and sentencing hearing.  Summ. J. Mot. Exh. B, ECF No. 13-2 (the "Plea Hearing Transcript" or "Plea Hrg. Tr.").  At that hearing, at which he was represented by counsel, Mr. Heilbron pleaded guilty to a single charge of Assault in the Third Degree, a class "A" misdemeanor.  *Id*.  In entering his plea, he responded to a series of questions from Judge Brandt, as follows:

The Court:  You are pleading guilty to assault in the third degree, a violation of 120.00 of the penal law.  This is an A misdemeanor.  It subjects you to a criminal record.  Are you pleading guilty of your own free will?

[Mr. Heilbron]:  Yes.

The Court:  On or about [6]/29 of last year, about 10:30 in the evening at 78th Street and 21st Avenue in Queens, you knowingly assaulted another person and caused injury to that person, is all this true?

[Mr. Heilbron]:  Yes.

The Court:  Is that acceptable to the People?

[The People]:  Yes.

The Court:  The sentence is a conditional discharge, you have to stay out of trouble for one year, take the 12 week anger management program, and perform five days community service.  You have to pay $200.00 in court fees, $50.00 in DNA fees, total of $250.00.  And, you must obey an order of protection.  Queens

4

> Compliance Part on April 8th, to show proof and to pay.  If you need an extension
> you will be given an extension.

Plea Hrg. Tr. at 2:9-3:8.

About three weeks later, on February 27, 2009, the Queens Criminal Court issued a

Certificate of Disposition, No. 86659, which provided that Mr. Heilbron agreed to plead guilty to

a single charge of a Class A misdemeanor, all other charges were dropped, and his sentence did

not include a period of incarceration.  Plea Hrg. Tr. at 4.

New York Penal Law Section 120.00, pursuant to which Mr. Heilbron entered his plea,

has three disjunctive subsections, as follows:

> A person is guilty of assault in the third degree when:
>
> 1.  With intent to cause physical injury to another person, he causes such injury to
>     such person or to a third person; or
>
> 2.  He recklessly causes physical injury to another person; or
>
> 3.  With criminal negligence, he causes physical injury to another person by
>     means of a deadly weapon or a dangerous instrument.

N.Y. Penal Law § 120.00.  Neither the court nor Mr. Heilbron referred to, and his plea did not

identify, a subsection of this statute to which Mr. Heilbron pleaded guilty.

*The Queens Supreme Court Action*

On or about March 30, 2009, about two months after Mr. Heilbron entered his guilty

plea, Mr. Plaza sued Mr. Heilbron in the Supreme Court of the State of New York, County of

Queens, seeking monetary damages arising from the assault.  Summ. J. Mot. Exh. D, ECF No.

13-5 (the "Verified Complaint").  On June 12, 2009, the Verified Summons and Verified

Complaint were served by Samara Kane on Jack Sheldon, a co-worker of Mr. Heilbron at the

"Carlyle Hotel-Stewarding [Department]," at the 77th Street Service Entrance.  Summ. J. Mot.

Exh. G at p. 33, ECF No. 13-8.  And on June 15, 2009, Ms. Kane mailed a copy of the Verified

Summons and Verified Complaint to Mr. Heilbron at his place of business.  *Id.*

In the Verified Complaint, Mr. Plaza alleges causes of action for assault and battery and

seeks an award of costs.  He states that, on June 29, 2008, Mr. Heilbron "assaulted [Mr. Plaza], .

. . causing him to sustain severe and permanent injuries."  Verified Complaint, ¶ 3.  Mr. Plaza

further alleges, "[t]hat the aforesaid conduct by [Mr. Heilbron] was with the intent [to] cause

physical, emotional, and/or psychological harm and/or injury to [Mr. Plaza]."  Verified

Complaint ¶ 21.  Finally, he states that as a result of the altercation with Mr. Heilbron:

> [he] was rendered sick, sore, lame and disabled; sustained severe and painful
> personal injuries; sustained severe nervous shock, mental anguish and great
> physical pain; . . . suffered loss of enjoyment of life; was prevented from
> engaging in his usual occupation for a period of time; and since some of his
> injuries are of a permanent nature, he will continue to suffer similar damages in
> the future.

Verified Complaint ¶ 27.

Mr. Heilbron did not answer or otherwise respond to the Verified Complaint, and on July

20, 2009, Mr. Plaza moved for the entry of a default judgment.  Summ. J. Mot. Exh. F, ECF No.

13-7.  On August 31, 2009, the Queens Supreme Court entered an order granting Mr. Plaza's

motion for default judgment and scheduling an inquest and trial on damages for November 4,

2009.  Summ. J. Mot. Exh. E.

On November 4, 2009, the Queens Supreme Court held an inquest and trial on damages

and issued a decision on Mr. Plaza's motion for default judgment.  The court awarded Mr. Plaza

damages and costs as follows:

| | |
|---|---|
| Pain and Suffering: | $75,000 |
| Future Pain and Suffering: | $50,000 |
| Medical Expenses: | $200 |
| Interest: | Interest from August 31, 2009 until judgment is fully pledged |

Costs:                                    $1,132

Summ. J. Mot. Exh. F.  On November 18, 2009, the Queens Supreme Court entered the Default

Judgment.

More than five years later, and nearly seven years after it was entered, Mr. Heilbron

sought review of the Default Judgment.  Summ. J. Mot. Exh. G, ECF No. 13-9.  On August 29,

2016, Mr. Heilbron filed a request for an order to show cause for a temporary restraining order

and injunctive relief (the "OSC Request"), and argued that the Default Judgment was improper

because the Verified Summons and Verified Complaint were never properly served on him.  *Id.*

He sought an order staying the execution of judgment, vacating the Default Judgment, and

terminating the garnishments of his wages, among other relief.  *Id.*

In support of the OSC Request, Mr. Heilbron argued that he was not properly served

because the Verified Summons and Verified Complaint were served on his co-worker Mr.

Sheldon, not on him.  Summ. J. Mot. Exh. G, at 13.  He also argued that he never received the

Verified Summons and Verified Complaint that were mailed to his place of business, and that he

was not authorized to receive personal mail at that address.  *Id.*  In addition, he argued that even

if service was made at his home address, it was not proper under CPLR § 308.  *Id.*  For those

same reasons, Mr. Heilbron argued that the motion for default judgment was untimely, and that

the Default Judgment should be vacated.  Summ. J. Mot. Exh. G, at 17.

In addition, Mr. Heilbron argued that he had meritorious defenses to Mr. Plaza's claims,

and that he should have the opportunity to assert them.  Summ. J. Mot. Exh. G, at 12.  In light of

these defenses, he asserted that injunctive relief was warranted in order to prevent irreparable

harm in the form of the continued garnishment of his wages.  Summ. J. Mot. Exh. G, at 17.

Finally, Mr. Heilbron argued that the record did not support the finding that Mr. Plaza had suffered pain and injury such that damages in excess of $124,000 were warranted.  Summ. J. Mot. Exh. G, at 14.

On December 5, 2016, the Queens Supreme Court denied Mr. Heilbron's OSC Request. The court found that Mr. Heilbron "does not set forth a reasonable excuse for his default in appearing" and similarly did not set forth "a meritorious defense to the action."  Summ. J. Mot. Exh. H.

*This Bankruptcy Case*

On April 30, 2018, Mr. Heilbron filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 18-42486.  On the same day, Alan Nisselson was appointed as the Chapter 7 Trustee in the case.  On June 7, 2018, Mr. Nisselson filed a Report of No Distribution, and on August 8, 2018, Mr. Heilbron received a discharge.

*This Adversary Proceeding*

On May 7, 2018, Mr. Plaza commenced this adversary proceeding by filing the Complaint to seek a determination that the Default Judgment debt is nondischargeable under Bankruptcy Code Section 523(a)(6), because Mr. Heilbron's actions were "willful and malicious and meant to cause injury" to Mr. Plaza.  Compl. ¶ 8, ECF No. 1.

On May 10, 2018, Mr. Heilbron filed an answer to the Complaint (the "Answer").  In the Answer, Mr. Heilbron denied that his actions were "willful and malicious and meant to cause injury," and also denied that he "intended to injure [Mr. Plaza]" or "engaged in conduct that was substantially certain to cause injury to [Mr. Plaza]."  Compl. ¶¶ 8, 9; Ans. ¶ 1.  Mr. Heilbron further stated that his actions "were not willful and malicious; and [he] did not mean and intend for [Mr. Plaza] to sustain the injuries he sustained."  Ans. ¶ 1.

Mr. Heilbron also denied that he knowingly assaulted Mr. Plaza and states that "while [Mr. Heilbron] knowingly became engaged in a fight he did not knowingly intend to injure [Mr. Plaza] in the manner that he was injured."  Ans. ¶ 2.

Mr. Heilbron asserted three affirmative defenses.  He asserted that Mr. Plaza's "injuries were caused in whole or part by his own actions in intimidating, harassing, threatening, defendant and mutually engaging in a fight of passion over a common female love interest," that he and Mr. Heilbron "were knowingly engaging in a mutual fight . . ., in the heat of passion, however, he never intended, willfully and maliciously to injure [Mr. Plaza]," and that his "conduct and [Mr. Plaza's] mutual conduct was reckless and substantially certain to cause injury to each other."  Ans. ¶¶ 3-5.

On September 17, 2018, Mr. Plaza filed an amended complaint (the "Amended Complaint"), seeking a determination that the Default Judgment is nondischargeable under Section 523(a)(6):

> All or part of the debt owed to plaintiff by the debtor is non-dischargeable as it is a debt for willful and malicious injury caused by the debtor to Mr. Plaza as aforesaid within . . . the meaning of Section 523(a)(6) of the Bankruptcy Code.

Am. Compl. ¶ 21, ECF No. 6.

On September 19, 2018, Mr. Heilbron filed an Answer to the Amended Complaint (the "Amended Answer").  In the Amended Answer, Mr. Heilbron denied the allegation that he "assaulted plaintiff, Benjamin Plaza, Jr., by punching him in his chin, causing him to suffer, *inter alia*, a fractured mandible that required open reduction, internal fixation."  Am. Compl. ¶ 8.  *See* Am. Ans. ¶ A, ECF No. 7.  He also denied that his "actions were willful and malicious and meant to cause injury to" Mr. Plaza.  Am. Compl. ¶ 9.  *See* Am. Ans. ¶ A.  Mr. Heilbron further denied that his "actions intended to injure plaintiff, Benjamin Plaza, Jr., or [Mr. Heilbron]

engaged in conduct that was substantially certain to cause injury to Plaza."  Am. Compl. ¶ 10.
*See* Am. Ans. ¶ A.  Mr. Heilbron also asserted the affirmative defense that he "did not intend for
plaintiff to sustain the injuries complained of."  Am. Ans. ¶ B.

<u>*The Motion for Summary Judgment, Summary Judgment Decision, Appeal, and Remand*</u>

On December 20, 2018, Mr. Plaza filed the Summary Judgment Motion and an
accompanying memorandum of law (the "Summary Judgment Memorandum or "Summ. J.
Mem.").  In that motion, he argued that the Default Judgment is nondischargeable because it was
the result of a "'willful and malicious injury by the debtor to another entity'" under Section
523(a)(6).  Summ. J. Mem. ¶ 5, ECF No. 14-1.  He further argued that summary judgment was
warranted under the doctrine of collateral estoppel based on Mr. Heilbron's guilty plea and the
Default Judgment, which have preclusive effect under New York law.  Summ. J. Mem. ¶¶ 25,
43, 48.  While acknowledging that Mr. Heilbron's plea and Certificate of Disposition did not
specify a subsection of New York Penal Law § 120.00, Mr. Plaza argued that the assault was
nevertheless intentional in nature and noted that Mr. Heilbron admitted at his plea allocution that
he "'knowingly assaulted another person and caused injury to that person.'"  Summ. J. Mem. ¶
28 (quoting Plea Hrg. Tr. at 2:17-18).

Mr. Plaza stated that the Default Judgment should preclude a finding that Mr. Heilbron
had acted negligently or in self-defense because New York law does not support causes of action
for "negligent assault" or "negligent battery," and because the Queens Supreme Court rejected
Mr. Heilbron's OSC Request to vacate the judgment and to permit him to assert a defense of
self-defense.  Summ. J. Mem. ¶ 38 (citing *Babikian v. Nikki Midtown, LLC,* 60 A.D.3d 470, 471
(1st Dep't 2009)).  Mr. Plaza also stated that, as a consequence of his guilty plea, Mr. Heilbron
had waived the ability to assert any affirmative defense.  Summ. J. Mem. 12 n.1.  For these

reasons, Mr. Plaza concluded that the conduct at issue was sufficiently "willful" and "malicious" to establish nondischargeability of the debt under Section 523(a)(6).

On December 27, 2018, Mr. Heilbron filed opposition to the Summary Judgment Motion in the form of an affirmation of his attorney George Bassias (the "Bassias Affirmation" or "Bassias Aff.") and the affidavits of Mr. Heilbron (the "Heilbron Affidavit" or "Heilbron Aff.") and witness Holger Adrian Carrera (the "Carrera Affidavit" or "Carrera Aff."). Mr. Heilbron described a brief encounter where both parties may have been "throwing punches" and stated that he did not recall hitting Mr. Plaza. Heilbron Aff. ¶ 8, ECF No. 17-1. He argued that at most, he acted recklessly, and his actions therefore were not "willful" or "malicious" under the meaning of Section 523(a)(6), which requires a "deliberate or intentional injury." Bassias Aff. ¶ 6, ECF No. 17.

According to Mr. Heilbron, the Default Judgment did not establish more than reckless conduct. Further, collateral estoppel could not apply because the issue of his intent had not previously been litigated or adjudicated in a way that indicated his intention to be bound in future suits, and because the issues and standards were not identical. Bassias Aff. ¶¶ 8, 12. Mr. Heilbron also argued that a bankruptcy court's determination of dischargeability was "not limited to the judgment and record of a prior state court proceeding" and that the factual record did not support the entry of summary judgment. Bassias Aff. ¶ 9. *See, e.g.*, Heilbron Aff. ¶¶ 3, 4, 14-17, 19. Mr. Heilbron also disputed Mr. Plaza's description of the incident, stating that, among other discrepancies between their accounts, he recalls that the witness, Mr. Carrera, remained in the car during the altercation, and that he did not see Mr. Plaza fall or observe that Mr. Plaza appeared injured immediately after the incident. Heilbron Aff. ¶¶ 5, 6, 8.

Mr. Carrera recalled driving Mr. Heilbron to Mr. Plaza's home after Mr. Heilbron called

Mr. Plaza, stating that they "needed to talk" about Mr. Plaza's interactions with Mr. Heilbron's then-girlfriend, Melissa.  Carrera Aff. ¶¶ 2, 3, ECF No. 17-3.  Mr. Carrera stated that he remained in the car and could not hear the interaction between Mr. Heilbron and Mr. Plaza until he saw them "grabbing each other" and "getting into an altercation," at which point he got out of the car, separated the two, and returned to the car to leave with Mr. Heilbron.  Carrera Aff. ¶¶ 3-5.

Separately, Mr. Heilbron stated that he was never served with the Verified Summons and Complaint in the Queens Supreme Court Action which, he stated, were delivered to his workplace but not to him personally, and that he did not learn of that action until he became aware of the garnishment of his wages.  Heilbron Aff. ¶ 20.  Mr. Heilbron acknowledged that his counsel in the Queens Supreme Court Action did not succeed in setting aside the Default Judgment, and stated that he hired bankruptcy counsel to file the present bankruptcy case in lieu of pursuing an appeal in state court.  *Id.*

On January 15, 2020, this Court entered a Memorandum Decision on Plaintiff Benjamin Plaza, Jr.'s Motion for Summary Judgment (the "Summary Judgment Decision").  *Plaza v. Heilbron* (*In re Heilbron*), 2020 WL 259563 (Bankr. E.D.N.Y. 2020).   Considering the prior proceedings in the Queens Criminal Court Action and the Queens Supreme Court Action and application of New York's collateral estoppel rule, the Court found that Mr. Plaza had shown that there was no genuine dispute of material fact as to each of the elements of his Section 523(a)(6) nondischargeability claim, and that Mr. Heilbron had not met his burden to show that he did not have a full and fair opportunity to be heard in the prior proceedings.  *In re Heilbron*, 2020 WL 259563 at *25.

Mr. Heilbron timely appealed this Court's decision on January 26, 2020, and on January 28, 2020, the appeal was docketed in the District Court at case number 20-cv-00312 and assigned to Judge Carol Bagley Amon. ECF Nos. 23, 28. The District Court held oral argument on the appeal on February 5, 2021, at which the parties appeared and were heard, and on March 19, 2021, the District Court issued its Memorandum & Order (the "District Court Decision"). ECF No. 35; *Heilbron v. Plaza*, 2021 WL 1062034 (E.D.N.Y. Mar. 19, 2021).

The District Court found that, on appeal, Mr. Heilbron raised the issue of whether "his criminal conviction and accompanying admission that he 'knowingly' committed an assault [was] insufficient to satisfy the willful and malicious standard of § 523(a)(6)." *Heilbron v. Plaza*, 2021 WL 1062034 at *3 n.1. Finding that consideration of this issue was "'necessary to avoid manifest injustice'" and that it was "'purely legal'" with "'no need for additional fact-finding,'" the District Court addressed the issue of whether an admission of knowledge satisfied the willful and malicious standard of Section 523(a)(6). *Id.* (quoting *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000)). Significantly, the District Court stated that Mr. Heilbron did "not appear to dispute the Bankruptcy Court's conclusion that he had a full and fair opportunity to litigate the relevant issues in the Queens Criminal Court Action, nor that the conviction conclusively establishes the injury element of Plaza's nondischargeability claim." *Heilbron v. Plaza*, 2021 WL 1062034 at *3 n.2.

The District Court observed that "[a] conviction under New York Penal Law § 120.00(1) . . . necessarily establishes that a debtor willfully – that is, deliberately or intentionally – caused injury to another within the meaning of § 523(a)(6)," but a conviction under New York Penal Law § 120.00(2) would not suffice. *Heilbron v. Plaza*, 2021 WL 1062034 at *4. (citing *Vyshedsky v. Soliman* (*In re Soliman*), 515 B.R. 179, 191 (Bankr. S.D.N.Y. 2014)). The District

13

Court noted that, while Mr. Heilbron had been charged under Section 120.00(1), his guilty plea and Certificate of Disposition did not identify a particular subsection of Section 120.00. *Heilbron v. Plaza*, 2021 WL 1062034 at *5. And similarly, the District Court found that Mr. Heilbron's admission at his plea allocution of "knowingly" assaulting Mr. Plaza did not necessitate a finding of "intent," which is distinct from "knowledge" under New York law. *Id.* (citing New York Penal Law § 15.05). The District Court rejected Mr. Plaza's argument that Mr. Heilbron would necessarily have pleaded to intentional misdemeanor assault as stated in the charging documents, noting that at the plea hearing, the prosecutor stated that he was reducing the felony charge against Mr. Heilbron but did not reference the misdemeanor charge or specify a subsection of Section 120.00. *Heilbron v. Plaza*, 2021 WL 1062034 at *5.

The District Court concluded that "the record does not clearly establish that Heilbron was convicted of committing an intentional rather than a reckless assault," and "remand[ed] for a trial on whether Heilbron's conduct satisfies the willfulness element of § 523(a)(6)." *Heilbron v. Plaza*, 2021 WL 1062034 at *5. The District Court "further conclude[d] that Heilbron is not collaterally estopped from contesting maliciousness by his criminal conviction" and identified that issue as a matter to be determined on remand at trial. *Id.* Because Mr. Heilbron did not appeal the issue of injury, the District Court did not address this element. *Id.* Finally, the District Court declined to address Mr. Heilbron's arguments relating to the alleged procedural unfairness in this Court's application of collateral estoppel, finding that Mr. Heilbron had not preserved that issue for appeal. *Heilbron v. Plaza*, 2021 WL 1062034 at *6.

### The Evidentiary Record

On February 23 and 24, 2023, this Court conducted an in-person trial limited to the questions of whether Mr. Heilbron's conduct was "willful" and "malicious" under Section

523(a)(6).  Over two days of testimony, the Court heard from Mr. Plaza and Mr. Heilbron as

witnesses, and received several exhibits, including documents from the Queens Criminal Court

Action and the Queens Supreme Court Action.  *See* ECF No. 44 ("Feb. 23 Trial Tr."), ECF No.

45 ("Feb. 24 Trial Tr.").

*The Testimony of Mr. Plaza*

Mr. Plaza testified that he graduated in 2000 from Aviation High School.  Feb. 23 Trial

Tr. at 67:7-23.  Mr. Plaza stated that he knew that Mr. Heilbron had also attended Aviation High

School, though he did not recall if they had attended at the same time, and testified that he did

not know Mr. Heilbron at that time.  Feb. 23 Trial Tr. at 32:12-18.  Mr. Plaza acknowledged that,

by the time of the incident, he knew Mr. Heilbron "[t]hrough mutual friends."  Feb. 23 Trial Tr.

at 56:9-11; 66:20-22.

Mr. Plaza testified that he knew Melissa from Aviation High School, where they were

both students and that they became friends.  Feb. 23 Trial Tr. at 15:6-14.  Mr. Plaza also testified

that he did not know that Mr. Heilbron was dating Melissa at the time of the incident on June 28,

2008.  Feb. 23 Trial Tr. at 32:19-20; 43:5-7.  Finally, Mr. Plaza denied that he "went on a date

with Melissa during the time that Mr. Heilbron was dating her."  Feb. 23 Trial Tr. at 44:11-14.

Mr. Plaza further stated that he did not recall if he was following Melissa on social media during

that time.  Feb. 23 Trial Tr. at 44:17-20.

Mr. Plaza testified that, on June 28, 2008, at around 10:30 p.m., he was at his home and

getting ready to go to work for the midnight shift, from approximately 11:00 p.m. to 7:00 a.m. or

8:00 a.m., at LaGuardia Airport.  Feb. 23 Trial Tr. at 12:11-18.  He testified that, as he was

walking down his block on 78th Street towards his car, he saw Mr. Heilbron and another

individual that he did not recognize approach him.  Feb. 23 Trial Tr. at 12:20-13:10; 17:15-17.

Mr. Plaza testified that Mr. Heilbron approached him and asked him about "what's going on with Melissa," and that he replied that he didn't know what Mr. Heilbron was talking about.  Feb. 23 Trial Tr. at 13:16-18.

Mr. Plaza did not describe any further verbal exchange with Mr. Heilbron, stating:

Q.  Did [Mr. Heilbron] ever say to you, "I'm going to hit you?"

A.  No.

Q.  Did he ever say, "I'm here to beat you up?"

A.  No.

Q.  Is the only thing that he asked you about was about [sic] Melissa?

A.  Yes, from what I recall.

Feb. 23 Trial Tr. at 65:8-15.

Mr. Plaza testified that after Mr. Heilbron addressed him, the second individual "lacerated" his right ear.  Feb. 23 Trial Tr. at 13:18-19.  Mr. Plaza testified that in response to the laceration, he grabbed his ear and crouched down, and then Mr. Heilbron struck him in the side of the face one time with his left fist, breaking his jaw.  Feb. 23 Trial Tr. at 13:20-23; 16:18-17:3; 63:22-64:4.  Mr. Plaza testified that, because he was already crouching and had dropped his head, he did not see where Mr. Heilbron was aiming his punch, but recalled that Mr. Heilbron struck him "right after" the second person lacerated his right ear.  Feb. 23 Trial Tr. at 17:4-14; 18:3-6.  Mr. Plaza testified that, though he was directly looking at the ground, he was able to see Mr. Heilbron hit him because Mr. Heilbron was directly in front of him.  Feb. 23 Trial Tr. at 26:16-18; 28:8-23.  Mr. Plaza testified that after he was struck, he grabbed his jaw, which was bleeding profusely, and that "everything was happening so fast."  Feb. 23 Trial Tr. at 13:23-25.

Mr. Plaza estimated that the time between Mr. Heilbron speaking to him and punching him was "[n]o more than ten seconds." Feb. 23 Trial Tr. at 18:8.

Mr. Plaza testified that he "immediately" left and returned home, where he found his aunt, and called 911. Feb. 23 Trial Tr. at 14:1-3. He testified that his aunt is a registered nurse, and was able to administer first aid and control the bleeding before an ambulance came to take him to Mount Sinai Queens hospital. Feb. 23 Trial Tr. at 14:3-7. Mr. Plaza testified that after being triaged at Mount Sinai Queens, he was transferred to Mount Sinai Hospital in Manhattan to see an oral surgeon specialist. Feb. 23 Trial Tr. at 14:8-11. Mr. Plaza testified that at Mount Sinai Hospital, medical staff wired and set his broken jaw. Feb. 23 Trial Tr. at 14:11-12. Mr. Plaza indicated the front and side of his jaw and testified that his front jaw was "split in half," and his temporomandibular joint was also "broken in half." Feb. 23 Trial Tr. at 14:15-16. Because of this, Mr. Plaza testified, his treatment required him to have his jaw wired shut and to stay overnight "a couple of days" in the hospital, before his release to go home. Feb. 23 Trial Tr. at 14:17-19.

Mr. Plaza testified that he was aware that Mr. Heilbron was arrested, and the second person was not. Feb. 23 Trial Tr. at 18:13-16. He also stated that, though it had "been a while," he remembered being deposed in this action on August 30, 2018. Feb. 23 Trial Tr. at 27:5-12. Mr. Plaza disagreed with the notion that his memory of the incident had changed since his deposition, testifying that the incident "haunts" him and that he "remember[s] everything." Feb. 23 Trial Tr. at 29:18-21.

*The Testimony of Mr. Heilbron*

Mr. Heilbron testified that he attended Aviation High School, graduating in 2003. Feb. 23 Trial Tr. at 71:6-12. Mr. Heilbron testified that, at the time of the altercation, his girlfriend of

17

over six years was named Melissa, that she had been his "high school sweetheart," and that they

had dated throughout high school.  Feb. 24 Trial Tr. at 17:14-22.  Mr. Heilbron testified that, as

he had previously stated in an affidavit, he discovered Mr. Plaza had "friended [his] girlfriend on

social media, was flirting with her, and was trying to date her."  Feb. 24 Trial Tr. at 15:24-16:2.

Mr. Heilbron stated that the social media interaction was "the reason of Mr. Plaza and

[him]self talking that night."  Feb. 24 Trial Tr. at 16:3-4.  He said that "[l]ike anyone of [his] age

during that time," Mr. Plaza's apparent advances toward Melissa made him "uncomfortable," but

he "wasn't angry."  Feb. 24 Trial Tr. at 16:10-12.  And he stated that he called Mr. Plaza and

"asked him to talk about it."  Feb. 24 Trial Tr. at 16:12-13.  Specifically, he testified that he

called Mr. Plaza on a cell phone and stated that they "needed to talk."  Feb. 24 Trial Tr. at 16:22.

Mr. Heilbron stated that he asked Mr. Plaza where he was, that Mr. Plaza had responded he was

at home, and that he went to meet Mr. Plaza at his home.  Feb. 24 Trial Tr. at 17:6-8.

Mr. Heilbron testified that he and Mr. Carrera drove together to Mr. Plaza's home.  Feb.

24 Trial Tr. at 19:2-16; 20:19.  Mr. Heilbron testified that Mr. Carrera "stayed in the car" the

"whole time until he witnessed what had happened."  Feb. 24 Trial Tr. at 19:19-21.  Mr.

Heilbron testified that he recalled telling Mr. Carrera that he had to talk to Mr. Plaza because

"this guy is trying to talk to Melissa after all, it's crazy."  Feb. 24 Trial Tr. at 20:1-3.

Mr. Heilbron testified that he went to Mr. Plaza's house around 10:30 p.m. on the night

of the altercation.  Feb. 24 Trial Tr. at 33:8-10.  He stated that he had never, to his knowledge,

been in any fights before that night.  Feb. 24 Trial Tr. at 33:11-12.  Mr. Heilbron testified that

when he went to talk to Mr. Plaza, it was "[a]bsolutely not" his intention to hit him.  Feb. 24

Trial Tr. at 37:11-13.  He described meeting Mr. Plaza as follows:

> A. When I got there, Benjamin was outside.  I got out [of] the car.  We started
> talking about it.  He denied it.  And I said, I have proof, how can you do this to

> me?  I was upset because at the time I remember very clear that he had broken up with his girlfriend at the time, and he started hanging out with me and Melissa's friends, which is the photos that are evidence.
>
> And I said to him, what was happening?  He started saying, oh, that's BS, and I remember I showed him the information on the phone I had at the time, and then we started like swearing at each other.

Feb. 24 Trial Tr. at 20:21-21:5.

Mr. Heilbron further testified that he "might have punched [Mr. Plaza]" but did not "remember hitting him right on the jaw as he described it."  Feb. 24 Trial Tr. at 23:13-18.  By his recollection, Mr. Heilbron and Mr. Plaza "were grabbing each other" and Mr. Heilbron "also defended himself . . . so he tried to get me off."  Feb. 24 Trial Tr. at 23:20-22.  He testified that he remembered signing an affidavit that stated that he "[did] not recall if [Mr. Plaza] grabbed [him] first or if [he] grabbed [Mr. Plaza] first," that he "remember[ed] [he] fell on top of a car," that he "[did] not recall hitting [Mr. Plaza]," and that the two of them "may both have been throwing punches or he may just have hurt himself another way."  Feb. 24 Trial Tr. at 26:18-24.  And he said that he "think[s]" he hit Mr. Plaza, that Mr. Plaza hit him as well, and that Mr. Plaza "defended himself," so they "both hit each other."  Feb. 24 Trial Tr. at 36:22-24.  He could not recall specifically who had engaged first but acknowledged that he "might [have] hit [Mr. Plaza] first, yes."  Feb. 24 Trial Tr. at 36:25-37:1.

> He at the time was bigger than me physically.  So, I didn't go out and like beat him up as he was trying to make it look like.  We grabbed each other, Judge, and we started like kind of just yelling at each other.
>
> I don't remember punching him.  I had no intentions to beat him up or punch him. I was shorter than him.  I'm still shorter than him.  So, none of that happened the way he described it . . . .
>
> I might have hit him.  I'm right handed.  So, we kind of pulled each other off. That's when my friend Adrian came out, like, hey, what's going on?

Feb. 24 Trial Tr. at 21:6-16.

Mr. Heilbron also testified that, if he did throw a punch at Mr. Plaza, it was not with the intent to hurt him.  Feb. 24 Trial Tr. at 33:18-34:4.  In addition, he testified:

> Q.  Well, you knew that night, whether you punched him or not, that if you punched somebody in their jaw it's substantially likely you're going to break their jaw, correct, you would agree with that?
>
> A.  If you — yeah, if you punch someone in the jaw, yes.
>
> Q.  And whether you did it or not, on that night of the incident, you knew it was wrong to punch somebody in the jaw?
>
> A.  Of course, that's why I didn't do it because I knew that it was wrong.
>
> Q.  Yes or no, on that night, whether you did it or not, you knew it was illegal to punch somebody in the jaw?
>
> A.  Yeah, I knew that, yes.
>
> Q.  And you agree that, whether Mr. Plaza was trying to steal your girlfriend or not, you had no right to punch him that night, correct, you would agree with that?
>
> A.  Of course, yes.

Feb. 24 Trial Tr. at 34:6-21.  Mr. Heilbron stated that even when he and Mr. Plaza were grabbing at each other, it was not his intention to hit him.  Feb. 24 Trial Tr. at 37:14-16.  Specifically, he stated that, "[e]verything happened so fast, like he said.  It was – it was a reaction. I wouldn't even consider it a fight.  It was a quick wrestle.  A reaction.  We both were scared and we went home, so it was more of a reaction."  Feb. 24 Trial Tr. at 37:19-22.

At trial, Mr. Heilbron denied "beating up" Mr. Plaza, stating, "Did I go and intentionally beat up [Mr. Plaza]?  No.  Because this is true.  He was not hurt that night."  Feb. 23 Trial Tr. at 87:21-23.  He testified that he could not "explain how [Mr. Plaza's] jaw was broken in two places," stating that he has "been trying to figure that out for the past 15 years."  Feb. 24 Trial Tr. at 23:23-25.

Mr. Heilbron also testified that in other court documents, he had similarly maintained that he did not observe Mr. Plaza to be injured:

> Q. Now, in paragraph 5 you wrote, "Plaintiff and I became involved in an altercation that lasted a matter of minutes.  Immediately following the altercation, I did not see, nor do I believe that the plaintiff appeared to be in pain from our fight, nor did he appear to be suffering from any substantial injury," correct?
>
> A. That is correct.
>
> Q. But you admitted in Criminal Court that you caused him physical injury, correct?
>
> A. Yeah, when I was in front [of] the judge, I was admitting that him and I had got into a fight, so I said yes to that, but to answer your question, that day he was not hurt, because he went back to work that day.  And I have proof.

Feb. 23 Trial Tr. at 85:6-20.

Mr. Heilbron testified that he recalled signing an affidavit in which he stated that he "'[did] not recall ever hitting him in the jaw or anywhere else.'"  Feb. 24 Trial Tr. at 36:10-12.  In that affidavit, Mr. Heilbron also stated that it "'certainly was not [his] intention to break his jaw'" and that if he had broken Mr. Plaza's jaw, "'it was a spontaneous reaction while we were both wrestling.'"  Feb. 24 Trial Tr. at 36:12-16.  And he acknowledged that, in his affidavit, he described the incident as a "fight."  Feb. 24 Trial Tr. at 38:11-14.

When shown a copy of the Criminal Complaint, in which he was charged with "intent to cause serious, physical injury to another person," Mr. Heilbron testified that he "did not intend to, to hurt him."  Feb. 23 Trial Tr. at 71:13-18.  When asked if the judge at the plea allocution in the Queens Criminal Court Case had asked him if he was pleading guilty of his own free will, Mr. Heilbron responded, "I think so.  I believe so."  Feb. 23 Trial Tr. at 72:23-73:1.

Mr. Heilbron testified that he did not state that he had acted in self-defense at the plea allocution, but he "did [bring] up the case with [his] lawyer at that time."  Feb. 23 Trial Tr. at

74:21-24. He stated that he was "very confused" during the Queens Criminal Court Case. Feb. 23 Trial Tr. at 75:4. Mr. Heilbron testified that he first met his attorney "a few minutes" before the hearing and spoke with the attorney for "[n]o more than 15 minutes" that day. Feb. 23 Trial Tr. at 104:1-18. Nevertheless, Mr. Heilbron testified that he remembers following the advice of his attorney, stating:

> A. And I remember my attorney said just say yes, yes, and I'll get you out of here by tonight, so I was following his instruction which led me to my answering when I was facing the judge. I said yes and then I was let go that same time. That same night.

Feb. 23 Trial Tr. at 75:19-24; 79:17-20; 93:11-17. Mr. Heilbron testified that his attorney did not prepare him for the specific questions that the judge was going to ask and was told to "keep [his] hands together and just say yes." Feb. 23 Trial Tr. at 93:23-94:3.

Mr. Heilbron testified that he believed that his lawyer in the Queens Criminal Court Case told him that he was "facing a potential jail sentence." Feb. 23 Trial Tr. at 77:23-25. Mr. Heilbron agreed that he was "concerned about doing time," as he thought "anyone" would be. Feb. 23 Trial Tr. at 80:5-7. He testified that he was "scared that night" and "didn't even know what was going on." Feb. 23 Trial Tr. at 80:7-8. And he stated that he acted on the advice of counsel and with the objective of avoiding a prison term, stating:

> Q. And your goal in the criminal court case was to avoid going to jail, correct?
>
> A. I was — my goal was to prove I didn't do nothing wrong. I — I was just there. I was arrested. I went into the prison myself. I didn't even know what was going on. It was very confusing for me that day, and I met that lawyer, and he said don't worry about it, I'll get you out by tonight. Just say this, this, and that, and that's exactly what I did.

Feb. 23 Trial Tr. at 78:1-10. He also stated that his goal was "to get clear of whatever [he] was being accused of." Feb. 23 Trial Tr. at 78:21-22.

Mr. Heilbron testified that, sometime after he entered his plea, Mr. Plaza commenced a civil case against him and obtained a default judgment. Feb. 23 Trial Tr. at 80:18-21. He stated that, "when [he] found out," he then hired a lawyer to file a motion to vacate the Default Judgment. Feb. 23 Trial Tr. at 80:22-24. Mr. Heilbron testified that he had applied to become a police officer at the time of that motion. Feb. 23 Trial Tr. at 94:8-17. He testified that the Suffolk County Police Department informed him of a subpoena from Mr. Plaza's counsel for the purpose of obtaining employment information in order to garnish his wages, and that this was how he learned of the Default Judgment. Feb. 23 Trial Tr. at 94:20-95:3; 95:18-23. Mr. Heilbron stated that he had filed the motion to vacate the Default Judgment because he "did not know about this [Queens] lawsuit for a very long time." Feb. 23 Trial Tr. at 95:13-14. Mr. Heilbron stated that his goal in filing the motion to vacate the Default Judgment was "to resolve this matter." Feb. 23 Trial Tr. at 97:17-18.

Mr. Heilbron testified that, since the Default Judgment was entered in 2009, counsel for Mr. Plaza had garnished his wages "on multiple occasions, at two jobs," and that, "[a]s anyone in my shoes, yeah, would have," he wished for it to stop. Feb. 23 Trial Tr. at 99:12-22; Feb. 24 Trial Tr. at 8:17-22. He testified that, over the years, counsel for Mr. Plaza "seized several thousand dollars" from his salary and that "[n]obody would" like that. Feb. 24 Trial Tr. at 9:5-9.

Accordingly, Mr. Heilbron filed for bankruptcy. Feb. 24 Trial Tr. at 11:12-16. He stated that, in filing for bankruptcy, he had the aim of resolving the matter:

> A. Sir, my goal is for this to be over, and I want to prove that I had no intentions of hurting your client, and that's my goal is to find a resolution to this matter. And it's been going on for many years, and the reason why is because he was lying. I — so that's why we're here today.

Feb. 24 Trial Tr. at 11:19-23.

## *The Exhibits Received into Evidence*

Each party offered several exhibits, which were received into evidence.

### The Exhibits Offered by Mr. Plaza

Mr. Plaza offered ten exhibits, and each was received in evidence.

Plaza Exhibit 1 is the Criminal Complaint.

Plaza Exhibit 2 is the Plea Hearing Transcript.

Plaza Exhibit 3 is the Certificate of Disposition from the Queens Criminal Court Case.

Plaza Exhibit 4 is the summons and complaint in the Queens Supreme Court Action, dated March 26, 2009.

Plaza Exhibit 5 is an order of the Queens Supreme Court, dated August 31, 2009, granting Mr. Plaza's motion for default judgment without opposition and scheduling an inquest and trial on damages.

Plaza Exhibit 6 is the Default Judgment, with a stamp indicating that the Queens Supreme Court entered the Default Judgment on November 18, 2009.

Plaza Exhibit 7 is the affidavit, dated August 29, 2016, that Mr. Heilbron filed in the Queens Supreme Court Action, in connection with his OSC Request.

Plaza Exhibit 8 is the decision of the Queens Supreme Court, dated December 5, 2016, denying Mr. Heilbron's motion to vacate the Default Judgment.

Plaza Exhibit 9 is the Heilbron Affidavit in this adversary proceeding, ECF No. 17-1.

Plaza Exhibit 10 is the Memorandum of Law that Mr. Heilbron filed in the Queens Superior Court Action in support of the OSC Request.

### The Exhibits Offered by Mr. Heilbron

Mr. Heilbron offered five exhibits, and each was received into evidence.

Heilbron Exhibit 1 is the transcript of the August 30, 2018 deposition of Mr. Plaza, taken by counsel for Mr. Heilbron in connection with this adversary proceeding.

Heilbron Exhibit 2, Heilbron Exhibit 3, and Heilbron Exhibit 4 are color photographs taken at social events prior to the altercation between the parties and depicting Mr. Plaza and Mr. Heilbron, among other people.

Heilbron Exhibit 5 is the Carrera Affidavit.

### The Applicable Law

The Elements of a Bankruptcy Code Section 523(a)(6) Claim

Courts agree that "Section 523(a) provides a creditor with an 'avenue for excluding a specific debt from the debtor's general discharge if the creditor can establish certain requisite elements.'" *Suparo Int'l Inc. v. Kedia* (*In re Kedia*), 607 B.R. 101, 108 (Bankr. E.D.N.Y. 2019) (quoting *Itria Ventures LLC v. Chadha* (*In re Chadha*), 598 B.R. 710, 717 (Bankr. E.D.N.Y. 2019)).  In order to establish that a debt should not be discharged under Section 523(a)(6), a plaintiff must show that the debt at issue resulted from a "willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  That is, a plaintiff must establish three elements to succeed on a Section 523(a)(6) claim – first, that the debtor acted willfully; second, that the debtor acted maliciously; and third, that the debtor's willful and malicious actions caused injury to the plaintiff or the plaintiff's property.

"'Courts adhere to certain guiding principles' when assessing dischargeability under § 523(a)." *In re Kedia*, 607 B.R. at 108 (quoting *First Am. Bank of N.Y. v. Bodenstein* (*In re Bodenstein*), 168 B.R. 23, 27 (Bankr. E.D.N.Y. 1994)).  Specifically, because "[e]xcepting a debt from discharge can significantly affect a debtor's ability to make a fresh start," each exception from dischargeability must be "strictly construed in favor of the debtor and against the creditor."

*Staten Island Savings Bank v. Scarpinito* (*In re Scarpinito*), 196 B.R. 257, 261 (Bankr. E.D.N.Y. 1996) (citing *In re Bodenstein*, 168 B.R. at 27; *Hudson Valley Water Res., Inc. v. Boice* (*In re Boice*), 149 B.R. 40, 43 (Bankr. S.D.N.Y. 1992); *Horowitz Fin. Corp. v. Hall* (*In re Hall*), 109 B.R. 149, 153 (Bankr. W.D. Pa. 1990); *Schwalbe v. Gans* (*In re Gans*), 75 B.R. 474, 481 (Bankr. S.D.N.Y. 1987)); *accord, Nat.'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio* (*In re Bonnanzio*), 91 F.3d 296, 300 (2d Cir. 1996).

However, "such exceptions 'are to be construed in favor of the debtor only "so far as reasonable."'"  *In re Scarpinito*, 196 B.R. at 261 (quoting *In re Gans*, 75 B.R. at 482 (quoting *In re Soika*, 365 F. Supp. 555, 556 (W.D.N.Y. 1973))).  If a plaintiff in a Section 523 action makes a sufficient showing as to each element of his or her nondischargeability claim, the evidentiary burden then shifts to the debtor to rebut the prima facie case.  *In re Scarpinito*, 196 B.R. at 261 (citing *In re Bodenstein*, 168 B.R. at 28; *Sw. Fin. Bank & Tr. Co. v. Stratton* (*In re Stratton*), 140 B.R. 720, 724-25 (Bankr. N.D. Ill. 1992); *First Bank v. Colvin* (*In re Colvin*), 117 B.R. 484, 487 (Bankr. E.D. Mo. 1990); *In re Gans*, 75 B.R. at 482).

Willfulness is not the same as malice – as another court observed, "the terms 'willful' and 'malicious' are separate elements with distinct meanings and both must be satisfied by a preponderance of the evidence."  *Cocoletzi v. Orly* (*In re Orly*), 2016 WL 4376947, at *3 (Bankr. S.D.N.Y. Aug. 10, 2016) (internal citations omitted).  In general, "The willful element is satisfied when a person deliberately causes an injury to another, while the malicious prong requires that such action be unjustified or without just cause."  *Hernandez v. Greene* (*In re Greene*), 397 B.R. 688, 695 (Bankr. S.D.N.Y. 2008).

The Supreme Court also observed that the intent required under Section 523(a)(6) is akin to the intent required for an intentional tort – that is, "that the actor intend 'the *consequences* of

an act,' not simply 'the act itself.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62(1998)(quoting *Restatement (Second) of Torts* § 8A, comment *a*, p. 15 (1964)).  The Court stated that "[an] act which 'necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously.'"  *Kawaauhau*, 523 U.S. at 62-63 (quoting *Tinker v. Colwell*, 193 U.S. 473, 487 (1904)).

As to the first element, that the debtor acted willfully, the Bankruptcy Code does not define "willful."  As the Supreme Court has noted:

> The word "willful" is defined in Black's Law Dictionary as "voluntary" or "intentional."  Black's Law Dictionary 1434 (5th ed. 1979).  Consistently, legislative reports note that the word "willful" in § 523(a)(6) means "deliberate or intentional."  *See* S. Rep. No. 95-989, p. 79 (1978) U.S. Code Cong. & Admin. News pp. 5787, 5864; H.R. Rep. No. 95-595, p. 365 (1977) U.S. Code Cong. & Admin. News pp. 5963, 6320.

*Kawaauhau*, 523 U.S. at 61 n.3.  As the Supreme Court concluded, "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau*, 523 U.S. at 61 (emphasis in original).

Considering this same element, one bankruptcy court observed that "an act is willful, for the purposes of § 523(a)(6) when an actor had actual intent to cause injury or 'was substantially certain that the injury would occur.'"  *Owens v. Powell* (*In re Powell*) 567 B.R. 429, 434 (Bankr. N.D.N.Y. 2017) (quoting *Margulies v. Hough* (*In re Margulies*), 541 B.R. 156, 162 (Bankr. S.D.N.Y. 2015)).  Another noted that "[a]n act is willful when the debtor intends to inflict the injury or knew that the injury was substantially certain to result."  *In re Margulies*, 517 B.R. at 162 (internal citations omitted).  *See Weiss v. Alicea* (*In re Alicea*), 230 B.R. 492, 507 (Bankr. S.D.N.Y. 1999) (stating that "'[w]illful,' as used in § 523(a)(6), means 'a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury,' and includes

27

conduct that the actor is substantially certain will cause injury") (internal citations omitted);

*Aldous Green Co. v. Mitchell* (*In re Mitchell*), 227 B.R. 45, 51 (Bankr. S.D.N.Y. 1998)

(willfulness "includes conduct that the actor is substantially certain will cause injury") (internal

citations omitted).  Debts "arising from recklessly or negligently inflicted injuries do not fall

within the compass of § 523(a)(6)," even if the acts leading to such injuries may themselves be

intentional.  *Kawaauhau*, 523 U.S. at 64.

In addition, "[m]alice may also be implied from 'the acts and conduct of the debtor in the

context of [the] surrounding circumstances.'"  *Yash Raj Films (USA) Inc. v. Akhtar* (*In re*

*Akhtar*), 368 B.R. 120, 130-31 (Bankr. E.D.N.Y. 2007) (quoting *Yash Raj Films (USA) v. Ahmed*

(*In re Ahmed*), 359 B.R. 34, 42 (Bankr.E.D.N.Y.2005); *Navistar Fin. Corp. v. Stelluti* (*In re*

*Stelluti*)*,* 94 F.3d 84, 88 (2d Cir. 1996)).  Further, "a court may find malice 'when anyone of

reasonable intelligence knows that the act in question is contrary to commonly accepted duties in

the ordinary relationships among people, and injurious to another."  *In re Akhtar*, 368 B.R. at

132 (citation omitted).

Whether circumstances are sufficient to support a finding of malice is a fact-specific

determination, made on a case-by-case basis.  *See In re Stelluti*, 94 F.3d 88 (stating that malice

may be implied "by the acts and conduct of the debtor in the context of the surrounding

circumstances") (internal quotations and citation omitted).  "A court should look to the totality of

the circumstances to determine malice."  *Forrest v. Bressler* (*In re Bressler*), 387 B.R. 446, 455

(Bankr. S.D.N.Y. 2008).

Malice can be inferred from a defendant's criminal conviction, if the criminal court

necessarily found that, in substance, the defendant caused injury to a plaintiff without just cause

or excuse.  *In re Powell*, 567 B.R. at 437 (observing that "[t]he malice element can also be

inferred from Defendant's conviction because the criminal court implicitly found that Defendant caused injury to Plaintiff without just cause or excuse.").

But courts are careful to permit a defendant to have their day in court.  As one bankruptcy court observed in denying the plaintiff's summary judgment motion:

> Because the state law civil assault and battery cause of action did not require [the plaintiff] to establish that [the defendant] intended to injure [him] – a required element of the denial of discharge cause of action – the Judgment in the civil case is not alone sufficient to trigger collateral estoppel entitling [the plaintiff] to judgment declaring the debt non-dischargeable.  The issue is whether the missing element (intent to injure) is supplied by collateral estoppel from [the defendant's] guilty plea.  This is a close question on the record before the Court.

*In re Soliman*, 515 B.R. at 183.

To the same effect, an assertion of self-defense may amount to an admission that the underlying act was intentional and, in the event that justification is not established, an indication that the act was willful and malicious.  As the same court observed in ruling for the plaintiff after trial, "[the defendant] attempted to justify his actions by claiming that he bit the [plaintiff]'s nose in self-defense.  This is tantamount to an admission that [the plaintiff]'s injury was willfully caused."  *In re Soliman*, 539 B.R. at 699 (Bankr. S.D.N.Y. 2015).  *See Kleman v. Taylor (In re Taylor)*, 322 B.R. 306, 310 (Bankr. N.D. Ohio 2004) (finding that, where evidence did not support claim of self-defense, "the only conclusion that can be drawn is that, within the meaning of § 523(a)(6), the Defendant, in causing injury to the Plaintiff, acted both 'willfully' and 'maliciously.'").

As to the third element, that the debtor's actions caused injury to the plaintiff or the plaintiff's property, here too, the term "injury" is not defined in the Bankruptcy Code.  Courts give a plain meaning to the term "injury" when considering nondischargeability claims under Section 523(a)(6), and find that this element is met where the debtor's actions caused physical

harm to the plaintiff. *See, e.g.*, *In re Soliman*, 539 B.R. at 700 (stating that the plaintiff clearly suffered injury after being bitten in the nose by the debtor, requiring stiches); *In re Greene*, 397 B.R. at 695 (finding injury where the debtor stabbed the plaintiff in the abdomen with a knife); *In re Powell,* 567 B.R. at 433 (stating that the defendant indisputably caused serious injuries to plaintiff by knocking him to the ground and kicking him in the face, causing the plaintiff to suffer broken eye socket and orbital bone). Courts agree that "'[t]he conduct complained of must be intended to or necessarily cause injury in order for the debt to be determined nondischargeable.'" *Guggenheim v. Birnbaum* (*In re Birnbaum*), 513 B.R. 788, 803 (Bankr. E.D.N.Y. 2014) (quoting *In re Ahmed*, 359 B.R. at 41). As noted above, this element has been established, and was not at issue at the trial.

Finally, the standard of proof necessary in a nondischargeability action is by a preponderance of the evidence. As the Supreme Court has stated, "we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991). In such an action, the creditor bears the burden of proof on each element of the claim. *In re Bodenstein*, 168 B.R. 23, 28 (Bankr. E.D.N.Y. 1994) (citing *Benich v. Benich* (*In re Benich*), 811 F.2d 943, 945 (5th Cir. 1987); *Farina v. Balzano* (*In re Balzano*), 127 B.R. 524, 529 (Bankr. E.D.N.Y. 1991); *Smith v. Meyers* (*In re Schwartz & Meyers*), 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991)) (stating that "[t]he burden of proving that a debt comes within one of the statutory exceptions to dischargeability is upon the party opposing discharge of the debt.").

## Discussion

This nondischargeability action relates to events that occurred over fifteen years ago; and several prior proceedings in this and other courts have filled the intervening years. However, the

focus at trial was on a narrow piece of that narrative:  Mr. Heilbron's intent and state of mind at the time of the altercation between Mr. Plaza and himself.  To prevail on his nondischargeability claim, Mr. Plaza must show that the Default Judgment debt arose from a "willful" and "malicious" act which caused injury to himself or to his property.  11 U.S.C. § 523(a)(6).

In light of the District Court Decision, this Court now considers whether, after trial, Mr. Plaza has met his burden to show that Mr. Heilbron acted with "willful" and "malicious" intent under Section 523(a)(6).  Mr. Heilbron did not appeal, and the Court does not reconsider, the injury element of Mr. Plaza's nondischargeability claim, which this Court determined in Mr. Plaza's favor in the Summary Judgment Decision.  *See Heilbron v. Plaza*, 2021 WL 1062034 at *3 n.2.  If Mr. Plaza shows that Mr. Heilbron's actions were willful and malicious, then the debt will not be included within the scope of Mr. Heilbron's bankruptcy discharge, and Mr. Plaza will be permitted to continue his attempts to collect.  In order to establish nondischargeability, Mr. Plaza must prove both willfulness and malice by a preponderance of the evidence.  If he does not, then the debt will be discharged.

*Whether Mr. Plaza Has Established that Mr. Heilbron Acted Willfully*

Because the injury element of Mr. Plaza's nondischargeability claim was neither appealed nor remanded, the Court does not reconsider it here.  Accordingly, the first element that Mr. Plaza must establish, by a preponderance of the evidence, in order to prove his Section 523(a)(6) nondischargeability claim is that Mr. Heilbron acted willfully.

In order to find that Mr. Heilbron acted willfully, the Court must find that he acted in a manner that resulted in "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."  *Kawaauhau*, 523 U.S. at 61 (emphasis in original).  Mr. Plaza can demonstrate that intentional injury if he shows that Mr. Heilbron acted intending to inflict it, or if he "knew that the injury was substantially certain to result."  *In re Margulies*, 517 B.R. at

162.  The Court now considers the evidence at trial on the question of whether Mr. Heilbron acted "willfully."

Perhaps unsurprisingly given how much time has passed since the injury, Mr. Plaza and Mr. Heilbron's descriptions of the altercation reflect some differences.  For example, the witnesses presented divergent narratives of their physical postures towards one another.  By Mr. Plaza's account, he was in an entirely defensive posture, crouching and clutching at his bleeding ear before Mr. Heilbron first had contact with him.  Feb. 23 Trial Tr. at 13:20-23; 16:18-17:14; 63:22-64:4.  Mr. Plaza testified that he and Mr. Heilbron did not grab each other, and, other than the punch to the jaw, Mr. Heilbron did not grab him.  Feb. 23 Trial Tr. at 65:16-20.  Mr. Heilbron acknowledged in his testimony that he may have thrown the first punch, but he described a much more chaotic scene, with Mr. Plaza defending himself, and he and Mr. Heilbron grabbing each other, with their fists flying.  Feb. 24 Trial Tr. at 26:18-24; 36:22-37:1.  He testified that the altercation was a "quick wrestle."  Feb. 24 Trial Tr. at 37:19-22.

Likewise, the testimony of Mr. Plaza and Mr. Heilbron diverged significantly with respect to the extent of Mr. Carrera's involvement in their altercation.  Mr. Heilbron testified that, though he arrived at Mr. Plaza's neighborhood with Mr. Carrera, Mr. Carrera "stayed in the car" while Mr. Heilbron approached Mr. Plaza alone.  Feb. 24 Trial Tr. at 19:19-21.  And Mr. Carrera stated in his affidavit that he "waited in the car while they spoke" and did not emerge from the vehicle until after Mr. Plaza and Mr. Heilbron were physically engaged.  Carrera Aff. ¶ 3.  On the other hand, Mr. Plaza testified that he encountered Mr. Heilbron and an unknown individual, the latter of whom "lacerated" his right ear without provocation.  Feb. 23 Trial Tr. at 13:18-19.  Mr. Plaza's testimony is corroborated by the medical evidence, which shows that Mr. Plaza suffered four lacerations to his right ear.  Summ. J. Mot. Exh. C, ECF Nos. 13-3, 13-4.

At the same time, in other respects, the witnesses' testimonies align. For example, both Mr. Plaza and Mr. Heilbron agreed that their altercation began and finished quickly, with Mr. Plaza testifying that "everything was happening so fast" and Mr. Heilbron that "[e]verything happened so fast, like he said." Feb. 23 Trial Tr. at 13:24-25; Feb. 24 Trial Tr. at 37:19-22.

Taken together, the testimony of Mr. Plaza and Mr. Heilbron, and the corroborating evidence, does not establish that Mr. Plaza's injury was the result of a premeditated attack. The record shows that neither party recalls Mr. Heilbron verbally threatening Mr. Plaza in any way before or during the altercation – in fact, Mr. Plaza did not testify that he recalled any aspect of their telephone conversation. Feb. 23 Trial Tr. at 65:8-15; Feb. 24 Trial Tr. at 16:12-13; 16:22; 18:1. Mr. Heilbron did not testify that he expressed any aggression towards Mr. Plaza when speaking with Mr. Carrera, nor does Mr. Carrera's affidavit suggest that he did. Carrera Aff. ¶¶ 1-2; Feb. 24 Trial Tr. at 20:1-12. To the contrary, Mr. Heilbron testified that when he went to talk to Mr. Plaza, it was "[a]bsolutely not" his intention to hit or assault him. Feb. 24 Trial Tr. at 37:11-13. And Mr. Heilbron testified that Mr. Plaza was and remains physically larger than him and indicated that this would have deterred him from trying to "go out and like beat him up." Feb. 24 Trial Tr. at 21:6-16.

Viewed another way, the evidence does not establish, or even suggest, that Mr. Heilbron contacted Mr. Plaza or went to his neighborhood and home with the intention to cause physical injury to Mr. Plaza. That is, the record supports the conclusion that initially, Mr. Heilbron had an intent to confront Mr. Plaza, but not to injure him.

But this is not the end of the inquiry because, as Mr. Plaza notes, intent requires only an instant to form. *See* CJI2d[NY] Culpable Mental States – Intent (citing *People v. Getch*, 50 N.Y.2d 456 (1980)) (stating that in a criminal case, intent, which does not require

"premeditation" or "advance planning," must be "inferred beyond a reasonable doubt from the proven facts"). And here, Mr. Plaza testified that Mr. Heilbron struck him first, and significantly, Mr. Heilbron did not deny that he might have struck first.

As an objective matter, punching a person in the face with sufficient force to break that person's jaw is substantially certain to cause harm. *See Barbarino v. Chalfin* (*In re Chalfin*), 2018 WL 3359566, at *3 (Bankr. S.D.N.Y. July 9, 2018) (stating that "[i]t is implicit in the fact that you punch somebody in the head that you intend to cause them damage or intend to hurt them."); *In re Taylor*, 322 B.R. at 309 (Bankr. N.D. Ohio 2004) (finding that "the Defendant's actions were, in fact, 'willful' based upon the common sense notion that when one physically hits another with enough force to break another's jaw, an alternative, but plausible explanation is all but impossible to discern."); *In re Judge*, 630 B.R. 338, 345 (B.A.P. 10th Cir. 2021) (observing that "haymakers, like most garden-variety punches to the face, are objectively very likely to cause harm.") (internal citation omitted).

In a number of Circuits, this Court's inquiry would stop there. However, courts in the Second Circuit generally apply a subjective standard to determine willfulness. *In re Margulies*, 517 B.R. at 162.

Fortunately, this Court need not speculate regarding Mr. Heilbron's state of mind. In his Answer, Mr. Heilbron stated that his and Mr. Plaza's "mutual conduct was reckless and substantially certain to cause injury to each other." Ans. ¶¶ 3-5. At trial, Mr. Heilbron was asked on cross examination, "Well, you knew that night, whether you punched him or not, that if you punched somebody in their jaw it's substantially likely you're going to break their jaw, correct, you would agree with that?". Mr. Heilbron responded, "If you — yeah, if you punch

someone in the jaw, yes." Feb. 24 Trial Tr. at 34:6-10.  And perhaps unsurprisingly, Mr. Heilbron did not at any point contradict the substance of this response.

And finally, regardless of Mr. Heilbron's testimony that he did not observe Mr. Plaza to be injured at the time of the altercation, it cannot be reasonably disputed that Mr. Plaza was in fact injured, and as the District Court observed, the element of injury was not before the Court at trial.  Based on the entire record, the Court finds that Mr. Heilbron knew to a substantial degree of certainty that if he punched Mr. Plaza in the jaw, an injury to Mr. Plaza's jaw was substantially certain to result.  Accordingly, this Court finds that Mr. Plaza acted willfully when he did just that.

As a consequence, and based on the entire record, including the testimony of Mr. Plaza and Mr. Heilbron and the exhibits received in evidence, the Court finds and concludes that Mr. Plaza has met his burden to show that Mr. Heilbron acted willfully.

*Whether Mr. Plaza Has Established that Mr. Heilbron Acted Maliciously*

The second element that Mr. Plaza must establish in order to prove his Section 523(a)(6) nondischargeability claim is that Mr. Heilbron acted maliciously.

Because Section 523(a)(6) contains both "willful" and "malicious" as separate, distinct elements, a plaintiff's nondischargeability claim requires that they make a sufficient showing of each separate element.  *In re Orly*, 2016 WL 4376947, at *3 (internal citations omitted).  As a consequence, the Court next considers whether Mr. Plaza has established, by a preponderance of the evidence, that Mr. Heilbron acted maliciously.

To do so, Mr. Plaza must prove, again by a preponderance of the evidence, that Mr. Heilbron's actions were "'wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.'"  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quoting *In re Stelluti*, 94 F.3d at 87-88).  As before, the District Court found that Mr. Heilbron

was "not collaterally estopped from contesting maliciousness by his criminal conviction." *Heilbron v. Plaza*, 2021 WL 1062034 at *5. Thus, as with the element of willfulness, Mr. Plaza must go beyond the record of the Summary Judgment Decision and establish this element based upon the evidence adduced at the trial.

A useful starting point in assessing the evidence is the path followed by the bankruptcy court in *In re Soliman*. In that case, the court found that, though recklessness could not establish willfulness, it was a "close question" whether a prior determination of recklessness could prove malice. *In re Soliman*, 515 B.R. at 192. And there, as here, ultimately, the *In re Soliman* court proceeded to trial on the question of malice.

Here, Mr. Heilbron's guilty plea was necessarily under either New York Penal Code Section 120.00(1) or Section 120.00(2). And "reckless" or recklessness is the lesser of the two state of mind requirements established by these subsections of the New York Penal Code. N.Y. Penal Law § 120.00. As a consequence, while the record of Mr. Hebron's guilty plea in Queens Criminal Court does not identify the exact nature of Mr. Heilbron's plea, that record does establish, at a minimum, that his conduct was at least reckless. This is consistent with, and confirmed by, Mr. Heilbron's statements in this adversary proceeding. For example, in his Answer, Mr. Heilbron states that his and Mr. Plaza's "mutual conduct was reckless and substantially certain to cause injury to each other." Ans. ¶¶ 3-5. But again, this is not the end of the inquiry, because "[r]ecklessness alone does not establish an injury that is . . . malicious." *Woods v. Alexander* (*In re Alexander*), 503 B.R. 19, 22 (Bankr. W.D.N.Y 2013).

Generally speaking, "anyone of reasonable intelligence knows" that punching a person in the face "is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." *In re Akhtar*, 368 B.R. at 132 (citation omitted). And Mr. Heilbron

does not contest that the alleged conduct at issue – punching someone in the jaw – is wrongful, within the meaning of the statute.  To the same effect, Mr. Heilbron testified that, at the time of the incident, he knew that punching another person in the jaw was illegal and wrong.  Feb. 24 Trial Tr. at 34:11-21.  In addition, Mr. Heilbron agreed that "whether Mr. Plaza was trying to steal [his] girlfriend or not, [he] had no right to punch him that night."  *Id.*

Even when the conduct at issue is "malicious," a finding of nondischargeability under Bankruptcy Code Section 523(a)(6) requires that the conduct also be "without just cause or excuse."  *In re Greene*, 397 B.R. at 695.  So, if Mr. Heilbron establishes a just cause or excuse for his actions, Mr. Plaza's proof will fall short, and he will fail to satisfy this element of his nondischargeability claim, even if the conduct was in fact malicious.

One example of a "just cause or excuse" that has been recognized by courts in the appropriate circumstances is self defense.  For example, in *In re Soliman*, the court found that a valid self-defense claim could have been the kind of "just cause or excuse" that would defeat a finding of malice.  *In re Soliman*, 539 B.R. at 700.  But here, Mr. Heilbron's testimony is not consistent with a self-defense claim.  As Mr. Heilbron testified at trial, while he may have raised the issue with his criminal defense counsel, he did not assert a claim of self defense in the Queens Criminal Case.  Feb. 23 Trial Tr. at 74:21-24.  And while Mr. Heilbron testified that it was possible that either he or Mr. Plaza might have grabbed each other first during the altercation, he also acknowledged in his testimony that he "might" have struck Mr. Plaza first, thereby undermining a self-defense claim.  Feb. 24 Trial Tr. at 26:18-24; 36:25-37:1.  Additionally,  Mr. Heilbron testified that he "think[s]" he hit Mr. Plaza and, in fact, that Mr. Plaza "defended himself," so they "both hit each other."  Feb. 24 Trial Tr. at 36:22-24.

That is, here, the evidence at trial does not show, or even suggest, that Mr. Plaza either instigated the confrontation between Mr. Plaza and Mr. Heilbron, or that Mr. Plaza somehow escalated that confrontation to an extent that Mr. Heilbron would have been justified in defending himself with force.  Rather, Mr. Heilbron's testimony, even when viewed in the most favorable light, points to the conclusion that he viewed the encounter as a "mutual fight." Bassias Aff. ¶ 6.  Accordingly, the record does not support a "just cause or excuse" for the injury sustained by Mr. Plaza.

As a consequence, and based on the entire record, including the testimony of Mr. Plaza and Mr. Heilbron and the exhibits received in evidence, the Court finds and concludes that Mr. Plaza has met his burden to show that Mr. Heilbron acted maliciously.

*          *          *

Mr. Plaza needed to prove by a preponderance of the evidence that Mr. Heilbron acted both willfully and maliciously to render the debt nondischargeable under Section 523(a)(6), and he has provided sufficient evidence of both.  For these reasons, and based on the entire record, including the testimony of Mr. Plaza and Mr. Heilbron and the exhibits received in evidence, the Court finds and concludes that Mr. Plaza has met his burden under Section 523(a)(6) by a preponderance of the evidence.

**Conclusion**

For the reasons stated above, and based on the entire record, the Court finds that Mr. Plaza has established that Mr. Heilbron acted "willfully and maliciously" as required under Bankruptcy Code Section 523(a)(6).  Therefore, the Section 523(a)(6) exception to discharge applies to the Queens Supreme Court Default Judgment that Mr. Plaza obtained against Mr.

Heilbron, and the resulting debt is excluded from the scope of Mr. Heilbron's Chapter 7

bankruptcy discharge.

An order and judgment in accordance with this Memorandum Decision will be entered

simultaneously herewith.



Dated: Brooklyn, New York
September 28, 2023

Elizabeth S. Stong
United States Bankruptcy Judge